**NEWS AMERICA PUBLISHING, INC., Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Appellee,**

**The Committee for Media Diversity, et al., Wilbert A. Tatum, Intervenors.**

No. 88–1037.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 11, 1988.

Decided March 29, 1988.

Gen. Counsel, and C. Grey Pash, Jr., Counsel, F.C.C., Washington, D.C., were on the brief, for appellee.

Kenneth Berlin, Washington, D.C., for intervenor, Wilbert A. Tatum.

Andrew Jay Schwartzman and David W. Danner, Washington, D.C., were on the brief, for intervenors, Committee for Media Diversity, et al.

Timothy B. Dyk, Patrick J. Carome and Teresa D. Baer, Washington, D.C., were on the brief, for intervenor, CBS, Inc.

Floyd Abrams, New York City, and W. Terry Maguire were on the brief, for amicus curiae, American Newspaper Publishers Ass'n, urging reversal.

Steven R. Shapiro, New York City, was on the brief, for amicus curiae, American Civil Liberties Union Foundation and the New York Civil Liberties Union, urging reversal.

Marshall E. Lippman, New York City, was on the brief, for amicus curiae, Newspaper and Mail Deliverers Union of New York and Vicinity, urging reversal.

Steven R. Ross, Gen. Counsel to the Clerk, Charles Tiefer, Deputy Gen. Counsel to the Clerk, Michael L. Murray, Asst. Counsel to the Clerk and Janina Jaruzelski, Asst. Counsel to the Clerk, U.S. House of Representatives, Washington, D.C., were on the brief, for amici curiae, Speaker and Bipartisan Leadership Group of the U.S. House of Representatives, urging affirmance.

Before ROBINSON, SILBERMAN and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

Dissenting Opinion filed by Circuit Judge ROBINSON.

Howard M. Squadron and Burt Neuborne, with whom Slade R. Metcalf, New York City, Michael R. Gardner and James P. Denvir, Washington, D.C., were on the brief, for appellant.

Diane S. Killory, Gen. Counsel, with whom Daniel M. Armstrong, Associate

WILLIAMS, Circuit Judge:

On December 22, 1987 Congress passed and the President signed a 471–page Continuing Resolution (printed only in a 1,194–page Conference Report) appropriating all of the funds for the federal government

for fiscal year 1988. Pub.L. No. 100–202, 101 Stat. 1329 (1987). On page 34, in a 379–word paragraph entitled "Federal Communications Commission Salaries and Expenses," sandwiched between a proviso concerning VHF channel assignments to educational stations and a restriction on cellular telephone systems in rural areas, appeared the following provision:

> Provided, further, that none of the funds appropriated by this Act or any other Act may be used to repeal, to retroactively apply changes in, or to begin or continue a re-examination of the rules of the Federal Communications Commission with respect to the common ownership of a daily newspaper and a television station where the grade A contour of the television station encompasses the entire community in which the newspaper is published, *or to extend the time period of current grants of temporary waivers to achieve compliance with such rules....*

*Making Further Continuing Appropriations for the Fiscal Year Ending September 30, 1988*, H.Rep. No. 498, 100th Cong., 1st Sess. 34 (1987) (*"Conference Report"*) (emphasis added). The provision's sponsor was Senator Hollings, and we will refer to it as the Hollings Amendment or simply the Amendment. As of December 22 the sole holder of any temporary waiver of the sort specified in the italicized phrase was News America Publishing, Inc. Under the natural and we think only reasonable construction of the phrase, its sole effect was to forbid extension of those waivers.

Despite the Amendment, News America applied to the Federal Communications Commission on January 14, 1988 for extensions of its waivers. The Commission denied the requests on January 19, 1988, finding that the Amendment barred any such extension and declining to consider News America's petition or its constitutional challenges to the Amendment. *News America Publishing, Inc.*, FCC 88–19, slip op. at 2 (Jan. 19, 1988). Naturally it did not reach the merits of News America's application. News America petitioned for review, moving for expedited treatment and for a stay of the FCC's order. We granted both motions and stayed the Commission's ruling until 45 days following our decision in this appeal.

The critical last 18 words of the Amendment are general in form but not in reality; they burden a single publisher/broadcaster. We conclude that under the First and Fifth Amendments we must scrutinize such legislation under a test more stringent than the "minimum rationality" criterion typically used for conventional economic legislation under equal protection analysis. Although the decisions of the Supreme Court and this circuit leave some doubt as to the exact characterization of the proper standard, any that is appreciably more stringent than "minimum rationality" requires invalidation of the challenged phrase.[1]

## I. BACKGROUND

The FCC's newspaper-broadcast cross-ownership rule provides generally that the Commission may not grant a television broadcast license to a party who owns or controls a daily newspaper in the same

---

1. News America also challenges the remainder of the Hollings Amendment, which forbids FCC re-examination of the newspaper-television cross-ownership rules. That proviso is not ripe for review at this time. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). It is far from clear that, once the FCC has opened its door to News America's application, the Amendment's barrier to FCC rethinking of the cross-ownership rules will be an obstruction to relief.

We do not, moreover, believe that the two portions of the Hollings Amendment must stand or fall together. The question of whether one part of a statute is severable from another is primarily one of legislative intent, informed by a general presumption of severability. *Regan v. Time, Inc.*, 468 U.S. 641, 653, 104 S.Ct. 3262, 3269, 82 L.Ed.2d 487 (1984). Although the two parts of the Amendment are tangentially related, we see no indication that Congress would not have enacted the first part of the amendment without the second. *See Buckley v. Valeo*, 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976).

Because we do not reach News America's challenge to the first part of the Hollings Amendment, references to the challenged phrase or clause refer only to the last 18 words of the Amendment.

community.[2] 47 C.F.R. § 73.3555(c). The Commission has, however, provided for both temporary and permanent waivers of the rule. If a broadcast licensee acquires a daily newspaper, the Commission's practice is to grant automatically a temporary waiver for one year or until the license renewal date, whichever is longer. *Second Report & Order,* 50 F.C.C.2d 1046, 1076 n. 25 (1975). Temporary waivers of varying durations are also available if a newspaper publisher acquires a broadcast station. *See, e.g., Metromedia Radio & Television, Inc.,* 102 F.C.C.2d 1334, 1353 (1985), *aff'd Health & Medicine Policy Research Group v. FCC,* 807 F.2d 1038 (D.C.Cir. 1986).

The Commission is ready to grant discretionary waivers or extensions on any of several grounds. The owner's having to sell at a distress price is one. *Second Report & Order,* 50 F.C.C.2d at 1085. Another is a showing that "separate ownership and operation of a newspaper and station cannot be supported in the locality." *Id.* Finally, the Commission allows waiver when "for whatever reason" the purposes of the rule would be best served by continued joint ownership. *Id.* The common

theme of the last two grounds is obviously to grant a waiver where enforcement of the rule would defeat rather than advance the goal of media diversity. Indeed, in upholding the cross-ownership rules against constitutional attack, the Supreme Court explicitly noted that the availability of waivers—where the station and paper could not survive without common ownership—"underscore[s]" the reasonableness of the rules. *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 802 n. 20, 98 S.Ct. 2096, 2115 n. 20, 56 L.Ed.2d 697 (1978).[3]

Although the *Second Report & Order* also provided for permanent waivers of the newspaper-broadcast cross-ownership rule, *Second Report & Order,* 50 F.C.C.2d at 1076 n. 24, 1085, the burden on an applicant for a permanent waiver is considerably heavier than for a temporary one. *Health & Medicine Policy Research Group,* 807 F.2d at 1042–43; FCC Brief at 27–28 n. 10. Only once, in a case involving "highly unusual facts," FCC Brief at 28 n. 10, has the Commission actually granted a permanent waiver of the newspaper-broadcast cross-ownership rule. *See Field Communications Corp.,* 65 F.C.C.2d 959 (1977).[4]

2. The rule provides in relevant part:
 No license for an AM, FM, or TV broadcast station shall be granted to any party (including all parties under common control) if such party directly or indirectly owns, operates, or controls a daily newspaper and the grant of such license will result in:
 \* \* \* \* \* \*
 (3) The Grade A contour for a TV station, computed in accordance with § 73.684, encompassing the entire community in which such newspaper is published.
 47 C.F.R. § 73.3555(c).

3. News America vigorously argues that the waiver procedure is essential to the rules' constitutionality. In light of our disposition we need not reach the issue.

4. In *Field Communications,* the Commission granted a permanent waiver to Field Communications, a corporation that, as a consequence of the grandfathering provisions, had been allowed to retain both a newspaper and a television station at the time of the promulgation of the cross-ownership rules in 1975. Field subsequently transferred a controlling interest in the station to another party but reserved the right to repurchase its interest and retained a significant role in affairs of the station. Field then reac-

quired the station as a result of the liquidation of the other party. In assessing the application for a permanent waiver, the Commission appears to have treated the reacquisition as little more than a *pro forma* transfer of control to a licensee already approved for cross-ownership, *Field Communications,* 65 F.C.C.2d at 961, and the permanent waiver as a virtually inevitable concomitant of the original grandfathering protection.

In view of the exceedingly restricted availability of permanent waivers, News America cannot be faulted for any failure to exhaust that avenue of relief. It is hard to conceive a case where any such application would be more obviously futile. *See Honig v. Doe,* — U.S. —, 108 S.Ct. 592, 606, 98 L.Ed.2d 686 (1988); *Glover v. St. Louis–San Francisco Ry. Co.,* 393 U.S. 324, 330, 89 S.Ct. 548, 551, 21 L.Ed.2d 519 (1969); *Public Utilities Comm'n of California v. United States,* 355 U.S. 534, 539–40, 78 S.Ct. 446, 450–51, 2 L.Ed.2d 470 (1958); *National Wildlife Federation v. Burford,* 835 F.2d 305, 317 (D.C.Cir.1987); *Cutler v. Hayes,* 818 F.2d 879, 891 (D.C.Cir. 1987); *Atlantic Richfield Co. v. Dep't of Energy,* 769 F.2d 771, 782 (D.C.Cir.1984); K. Davis, 4 *Administrative Law Treatise* § 26.11 at 464–68 (1983); *see also Skinner & Eddy Corp. v. United States,* 249 U.S. 557, 39 S.Ct. 375, 63 L.Ed. 772

News America is a corporation controlled by K. Rupert Murdoch, a recently naturalized American citizen with extensive broadcast and newspaper holdings in Australia, Europe, and North America. Murdoch also controls Fox Television, Inc. ("Fox"),[5] which owns numerous television stations throughout the United States.

In November 1985 and November 1986, Fox secured FCC permission for its acquisition of the licenses, respectively, of WNYW–TV in New York City and WXNE–TV in Boston. Because News America owned the *New York Post* and the *Boston Herald,* these acquisitions required waivers of the cross-ownership rule, which the Commission granted (two years for the New York cross-ownership, 18 months for that in Boston).[6] *Metromedia,* 102 F.C.C. 2d at 1353 (New York); *Twentieth Holdings Corp.,* 1 F.C.C.Rcd. 1201 (1986) (Boston). Time ran out on March 6, 1988 for the New York interests, and in the absence of waiver extensions will run out on June 30, 1988 for those in Boston. Unless Murdoch sells the Herald or WXNE–TV or secures relief, Fox will face "administra-

tive remedies to assure compliance," *Metromedia,* 102 F.C.C.2d at 1350, presumably including loss of the WXNE–TV license.

Counsel for News America have informed us by letter that it sold the *Post* effective March 7, thus appearing to moot its claims as to that newspaper and WNYW–TV. This change does nothing, however, to moot News America's constitutional challenge with respect to the *Herald* and WXNE–TV.[7]

News America's primary claims[8] lie at the intersection of the First Amendment's protection of free speech and the Equal Protection Clause's requirement that government afford similar treatment to similarly situated persons. (Although the Equal Protection Clause appears only in the 14th Amendment, which applies only to the states, the Supreme Court has found its essential mandate inherent in the Due Process Clause of the Fifth Amendment and therefore applicable to the federal government. *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).) Where legislation affecting speech appears under-

---

(1919) (exhaustion necessary only where there is an appropriate avenue of relief to exhaust); L. Jaffe, Judicial Control of Administrative Action 426–28 (1965). Quite apart from the narrow availability of permanent waivers generally, it is altogether unrealistic to suppose that an agency as sensitive to congressional desires as the FCC, *see Meredith Corp. v. FCC,* 809 F.2d 863, 872–73 & n. 11 (D.C.Cir.1987) (Commission counsel observes at oral argument that language in committee reports "did not bind them legally, only 'as a practical matter'"), would grant a permanent waiver where Congress indicated hostility to extension of even a temporary one.

5. Fox was previously known as News America Television, Inc. For the sake of clarity, we refer to this entity throughout simply as "Fox." *See Health & Medicine Policy Research Group v. FCC,* 807 F.2d 1038, 1040 n. 1 (D.C.Cir.1986).

6. The transaction involving the sale of WNYW–TV from Metromedia to Murdoch also included the transfer of WFLD–TV, a Chicago UHF station, to Fox. At that time News America also owned a major Chicago daily, the *Chicago Sun–Times.* Fox therefore sought and obtained a two-year waiver for the Chicago properties as well. Four months after obtaining the waiver, however, News America sold the *Sun–Times.*

7. Intervenor Committee for Media Diversity argues in a "Suggestion of Partial Mootness" filed

March 10 that News America's disposition of the *Post* moots the entire claim. Its argument appears to rest on alleged substantive defects with News America's petition for extension of its Boston waiver. The argument is evidently a suggestion that we should avoid the constitutional question by affirming the Commission's action on grounds never addressed by the Commission. This we may not do. *SEC v. Chenery Corp.,* 318 U.S. 80, 87–88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). Nor would a remand to the Commission to consider the merits serve any purpose; under its view that the Hollings Amendment is constitutional, it would never reach them.

8. News America also contends that the last 18 words of the Hollings Amendment (1) constitute a forbidden Bill of Attainder; (2) violate certain principles of separation of powers; (3) effect a taking of property without adequate compensation in violation of the Fifth Amendment; (4) violate the Due Process Clause of the Fifth Amendment; and (5) violate the presentment clause of Article I because the President was given no "meaningful" opportunity to veto it. We find it unnecessary to address these contentions, however, in view of our finding of a violation of the free speech and equal protection guarantees of the First and Fifth Amendments.

inclusive, *i.e.*, where it singles out some conduct for adverse treatment, and leaves untouched conduct that seems indistinguishable in terms of the law's ostensible purpose, the omission is bound to raise a suspicion that the law's true target is the message. Accepting that intuition without making an actual determination of the legislators' motives, the Supreme Court has for the regulation of speech insisted on a closer fit between a law and its apparent purpose than for other legislation. *See Arkansas Writers' Project v. Ragland,* —— U.S. ——, 107 S.Ct. 1722, 1730, 95 L.Ed.2d 209 (1987); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 592, 103 S.Ct. 1365, 1375, 75 L.Ed. 2d 295 (1983); *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972).

Two circumstances complicate our analysis here. First, two intervenors—*not,* significantly, the FCC—contend that the challenged clause potentially bears upon other publisher/broadcasters than Murdoch.[9] Second, special characteristics of broadcasting have led the Supreme Court to give Congress greater latitude in broadcast regulation than it or any state legislature would enjoy in the regulation of printed (or other non-broadcast) speech. We find that in fact the clause covers only Murdoch. Further, we believe that even in broadcast regulation the First and Fifth Amendments demand a better fit between the law and its asserted legitimate purposes than we can find in the Hollings Amendment.

**9.** Citing our decision in *Central Television, Inc. v. FCC,* 834 F.2d 186 (D.C.Cir.1987), intervenor Committee for Media Diversity ("CFMD") also argues that we have no jurisdiction to hear News America's appeal because News America is challenging conditions attached to its broadcast licenses. CFMD Brief at 13–15. This is silly. News America challenges the Hollings Amendment's restrictions on waiver extensions, not the terms of the initial waiver.

**10.** These two intervenors have standing on the basis of their claims that Tatum and the members of CFMD are viewers and readers of affected stations and newspapers. Tatum also claims standing as a potential purchaser of the *Post;* we doubt whether a party hoping to buy a paper at advantageous prices is within the zone of

## II. THE MEANING OF THE CLAUSE

The final 18 words of the Hollings Amendment forbid the Commission from "extend[ing] the time period of *current grants* of temporary waivers to achieve compliance with [the newspaper-television cross-ownership rule]." *Conference Report* at 34 (emphasis added). On their face these words apply only to newspaper-television cross-ownership waivers in effect on enactment, *i.e.,* the two held by Murdoch.

Intervenors Committee for Media Diversity ("CFMD") and Wilbert A. Tatum,[10] however, argue that "current" was inserted only to ensure that the Amendment would have retroactive application to News America's waivers. On their view the Amendment would apply to *all* parties who hold temporary waivers during the fiscal year. CFMD Brief at 10; Tatum Brief at 13–14.

The interest in courts' avoiding constitutional questions must of course influence our construction of the statute; it does not, however, require Olympic exegetical acrobatics. *CFTC v. Schor,* 478 U.S. 833, 106 S.Ct. 3245, 3252, 92 L.Ed.2d 675 (1986) (courts may not ignore legislative will in order to avoid constitutional adjudication). To accept intervenors' construction would require no less. First, "current" has a well-accepted meaning in ordinary usage; Webster's *Third New International Dictionary* (1981) defines the word as "occurring in or belonging to the present time: in evidence or *in operation at the time actually elapsing.*" *Id.* at 557 (emphasis added). The only grants of waivers in effect

interests sought to be protected or regulated by Congress, but need not reach the issue. CBS Inc. seeks to intervene, raising arguments as to the constitutionality of the cross-ownership rules. We need not examine whether its interests are sufficiently affected by those rules, as we find that issue unripe. *See* note 1, *supra.*

The American Civil Liberties Union Foundation and the New York Civil Liberties Union, the American Newspaper Publishers Association and the Newspaper and Mail Deliverers' Union of New York and Vicinity have filed *amicus* briefs in support of News America; the Speaker and Bipartisan Leadership Group of the U.S. House of Representatives have filed an *amicus* brief in support of the FCC.

on December 22, 1987 were News America's; other temporary waivers which might be granted during the course of the fiscal year 1988 could not on December 22 be described as "current grants." In the absence of ambiguity in statutory language, we must give effect to the plain meaning of the words Congress has chosen. *Escondido Mutual Water v. La Jolla Band of Mission Indians,* 466 U.S. 765, 772, 104 S.Ct. 2105, 2110, 80 L.Ed.2d 753 (1984); *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *Consumer Product Safety Commission v. GTE Sylvania,* 447 U.S. 102, 108–09, 100 S.Ct. 2051, 2056–57, 64 L.Ed.2d 766 (1980); *United Scenic Artists, Local 829, Brotherhood of Painters & Allied Trades, AFL–CIO v. NLRB,* 762 F.2d 1027, 1032 n. 15 (D.C.Cir.1985).

Second, an agency can "extend" only a waiver that exists at the time of extension. Without the word "current," the clause would bar any extension that the Commission might wish to provide during the effective period of the Continuing Resolution, *i.e.,* from December 22, 1987 until September 30, 1988. Thus insertion of the modifier was quite unnecessary to assure inclusion of Murdoch. And, had any member of Congress familiar with the legislation entertained the fear now raised by intervenors, the natural solution would have been to specify "current and future" temporary waivers. We cannot read "current" to mean "current and future."

Third, the Commission, which is the agency charged with administering the statute, interprets the word "current" unsurprisingly to apply solely to temporary waivers outstanding at the time the Continuing Resolution was passed. FCC Brief at 34. (At oral argument the Commission's General Counsel explicitly stated that the brief represented the views of the Commission, not just its lawyers. Transcript of Oral Argument at 36.) We doubt we could accept intervenors' view even if the Commission endorsed it, for the language resolves the issue. *See NLRB v. United Food & Commercial Workers Union,* —— U.S. ——, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987); *INS v. Cardoza Fonseca,* ——

U.S. ——, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987). In any event, as the language clearly does not decide the issue in the way intervenors urge, we must accept the Commission's plainly reasonable view. *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

With language, common sense and the Commission against them, intervenors point to remarks made in Congress approximately one month *after* the Continuing Resolution was adopted. Though at first Senator Hollings stated that his Amendment applied only to Murdoch, *see* 134 Cong.Rec. S63 (daily ed. Jan. 26, 1988), he reversed field the next day and asserted that it applied also to any future temporary waivers which might be granted:

> I want to make sure everyone understands why I authored this law. This law serves the useful purpose of ensuring that the intent set forth in the first half of this amendment, that the FCC not modify the existing criteria for permanent waivers, not be evaded through the successive grants of temporary waivers. This applies to any extension of any temporary waiver which is granted, not just the outstanding temporary waivers held by Mr. Murdoch.

*Id.* at S139 (daily ed. Jan. 27, 1988). Senator Kennedy echoed this view:

> At the same time, I want to emphasize that the amendment was not directed specifically at Mr. Murdoch or his waivers, but at all persons who would be similarly situated, and at all waivers, now or in the future, in situations where persons such as Mr. Murdoch would be seeking to evade the cross-ownership rule by obtaining a permanent exemption in the guise of a series of temporary waivers.

*Id.* at S59 (daily ed. Jan. 26, 1988).

Even in ordinary circumstances courts give little or no weight to such post-enactment statements. *See Regional Rail Reorganization Act Cases,* 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974); *Public Citizen v. Young,* 831 F.2d 1108,

1117 (D.C.Cir.1987). Here the timing renders the statements still more suspect. At the time of adoption, the Amendment had received *no* comment whatsoever in any congressional committee or on the floor of either house. The only mention of the provision in the Conference Report was a restatement of the exact language of the Amendment (except that the word "rules" in the Continuing Resolution is replaced by "regulations" in the Report). *Conference Report* at 504. Its very existence was known to only a few legislators; indeed, the Amendment's sponsors apparently neglected to inform either of the two Senators from the *Post's* home state or the junior Senator from Massachusetts of the Amendment or its intended effect. 134 Cong.Rec. at S54 (statement of Senator Symms); *id.* at S55 (same); *id.* at S64 (statement of Senator Packwood); *id.* at S140 (statement of Senator D'Amato); J.A. at 34, 38, 39, 40, 64 (newspaper accounts). Once discovered generally, a few days after enactment, the Hollings Amendment and its evident focus on Murdoch drew sharp attacks from the press and fellow legislators. *See* J.A. at 30–71 (newspaper accounts). Asserting the unconstitutionality of the Amendment, News America petitioned the FCC for an extension on January 14, 1988 and filed this lawsuit on January 21, 1988. The statements of Senators Hollings and Kennedy were made approximately one week later, with full knowledge of the existence of this lawsuit and of News America's legal claims. *See* 134 Cong.Rec. at S59 (Senator Hollings); *id.* at S139 (Senator Hollings); id. at S144 (Senator Kennedy). In short, there is simply no evidence that these post-enactment remarks represented congressional understanding at the time of enactment.

Indeed, the *full* text of the post-enactment Senate discussion, whatever its weight, serves to confirm our view that the Hollings Amendment was directed solely at Rupert Murdoch and his media holdings. The two brief remarks of Senators Hollings and Kennedy on the meaning of the Amendment occurred during debate on Senator Steven Symms's amendment to a civil rights bill—an amendment which would have repealed the Hollings Amendment. Except for those two statements, the discussion focused almost entirely on Murdoch and his temporary waivers. *See* 134 Cong.Rec. S54–69 (daily ed. Jan. 26, 1988); *id.* at S138–47 (daily ed. Jan. 27, 1988). Senator Symms began the debate on his amendment by discussing Murdoch, the effect of the Hollings Amendment· on his waivers, and the First Amendment ramifications of what he called "the anti-Murdoch measure." 134 Cong.Rec. at S54–55. Senator Hollings then took the floor to explain "what is really involved about the so-called dark of night and the civil rights of Mr. Murdoch." *Id.* at S56. Hollings addressed himself first to what he perceived to be the problem: "a runaway animal in the FCC." *Id.* He quoted a 1985 letter from Murdoch promising not to seek a permanent waiver and discussed Murdoch's participation in the Freedom of Expression Foundation, a public interest group that had petitioned the Commission for repeal of the cross-ownership rules.[11] *Id.* at S57. Hollings then explained the procedure by which his amendment was added to the Continuing Resolution, and attempted to rebut, paragraph by paragraph, a preamble to Senator Symms's amendment that was highly critical of the Hollings Amendment's origins. In explaining the amendment, Senator Hollings stated that

[Mark Fowler, former Chairman of the FCC] said at his retirement party: "The greatest gift I gave to anybody as Chairman of the FCC was an 18–month waiver to Rupert Murdoch." And everyone

---

**11.** Both Senators Hollings and Kennedy appeared to believe that the FEF was little more than a Murdoch front organization working in concert with News America. *See, e.g.,* 134 Cong.Rec. at S57 (Senator Hollings); *id.* at S59 (same); *id.* (Senator Kennedy). That perception is not borne out by the record in this case. FEF is a nonprofit organization supported by numerous daily newspaper publishers, broadcast licensees, newspaper and broadcast trade associations, and other corporations. J.A. at 307. For instance, the Washington Post and the Times Mirror organization are major contributors; News America apparently is a relatively minor one. News America Reply Brief at 11 n. 8.

clapped and said "Whoopee." That is the way we are doing business—cash and carry downtown at the Federal Communications Commission.

I want to stop it.

*Id.* at S58. Senator Hollings continued:

Murdoch is defended. He went to court already. He knows how to get injunctions on the spurious nonsense of some constitutional provision that provides [sic] only to him.

*Id.* at S59. The Senator concluded by stating that

[N]obody appeared in opposition to the cross-ownership rules other than this sneaky operation of Rupert Murdoch. Now, I found out that the prevaricator and the manipulator has gotten the high road of the headlines and editorials ...

*Id.*

Senator Kennedy was then recognized. After noting that he had joined Senator Hollings in adding the amendment to the Continuing Resolution, he stated that the action was intended to preserve the cross-ownership rule. He then said:

The fundamental question is whether Rupert Murdoch is entitled to thumb his nose at that law and become the only newspaper publisher in America who can buy a television station and keep his newspaper in the same community.

Mr. Murdoch was well aware of the law when he acquired his television stations in Boston and New York. He had a choice then, and he has a choice now. He can keep his newspaper—or he can keep his broadcasting station. But he cannot keep them both.... The principle is right—and Rupert Murdoch is wrong to try to change it. Instead of attacking me, he should try to explain why he thinks he's entitled to an exemption from the law.

Mr. Murdoch is one of the most powerful publishers in the world, and he has been using those powers to ignore the will of Congress, subvert the FCC, and evade the cross-ownership rule.

*Id.* Although Senator Kennedy then stated that "the amendment was not directed specifically at Mr. Murdoch," *id.*, he went immediately from that statement to a lengthy description of Murdoch's media interests, his temporary waivers and extensions, and what he called "Murdoch's effort to subvert the rule" in the FCC. *Id.* Specifically, Senator Kennedy stated that

It was widely anticipated that Murdoch would go in behind [the FEF] petition and ask the FCC to extend his waivers to sell the New York Post and the Boston Herald until any new FCC proceedings on the cross-ownership rule were completed.

In these circumstances, I went to Senator Hollings and urged him to save the cross-ownership rule.

*Id.* Senator Kennedy made other references to Murdoch: "Congress has learned the hard way to be skeptical about anything Mr. Murdoch says or does," *id.* at 60; "Murdoch should never have received a waiver in the first place, let alone a waiver for the unprecedented period of 2 years," *id.*; "[t]he agency had been captured lock, stock, and barrel by Rupert Murdoch, and it was long past time for Congress to step in," *id.* at 61. Senator Kennedy concluded his discussion of the Hollings Amendment by asserting that "Rupert Murdoch does not deserve an exemption from the cross-ownership rule—and it would be wrong for Congress or the FCC to give him one." *Id.*

Senator Symms then replied to Senators Hollings and Kennedy. In response, Senator Hollings conceded that his Amendment would affect only News America: "Yes, it affects Mr. Murdoch only because he is the only one trying to repeal the rule rather than what he said in his original letter to Senator Wirth, then Congressman Wirth on the House side, that his full intent was to comply." *Id.* at S63.

Senator Wirth himself joined the discussion soon thereafter. After describing his past dealings with Murdoch as chairman of the relevant House committee and inserting a letter from Murdoch into the record, Wirth addressed himself to "the equities involved in this":

Mr. Murdoch has gotten a waiver and now through a variety of mechanisms is attempting to get a full permanent waiv-

er of the cross-ownership rule. Tell me how fair that is.

*Id.* at S66. Senator Wirth compared Murdoch's actions with those of CapCities (another holder of a temporary waiver) and then returned to the subject of Murdoch alone:

Mr. Murdoch has had a waiver for 2 years. He knew going in when he bought Metromedia and owned those newspapers what the rules were. We explained them to him in my office. He wrote back and said "I know what the rules are." Then he went on to say, "I have no intention of going after a permanent waiver."

Now what has he done? He has turned around and gone after a permanent waiver. Is 2 years enough time or not enough time to go out and sell those newspapers to avoid the cross-ownership problem?

*Id.* at S67. Finally, Wirth attempted to defend the Hollings Amendment's exclusive focus on Murdoch's stations:

The second question raised by the Senator from Idaho [Symms], a good one, is, why is this provision focused just on these two stations? The question is, Why these two stations?

The answer is that everybody else complied with the rules except Rupert Murdoch. That is why it is focused on these two stations. It has nothing to do with the politics of Massachusetts. It has nothing to do with editorial cartoons. It has to do with the fact that everybody else complied with the law. The only people who have not complied with the law are the Murdoch group, which is trying to get this permanent waiver. That is why this is focused just on these people.

*Id.*

The Senate debated Senator Symms's proposal again the following day. Senator D'Amato of New York, concerned that the Hollings Amendment might result in the imminent closure of the *Post,* rose to criticize the Amendment and urge its repeal. Following a short statement by Senator Symms, Senator Wirth again described his past wrangles with Murdoch as a member of the House committee responsible for telecommunications, and then stated

Who is he to think that he is going to be able to sneak around this set of rules whether he sets up a nonprofit organization, a tax [sic—attacks?] fairness, and advocates his position, whether he goes around with a lot of very high-powered Washington lawyers, or whatever, and that one man is going to be able to obviate [sic] these rules.

*Id.* at S141. Wirth then contrasted the conduct of Capital Cities Communications, "an honorable American corporation," with that of "Rupert Murdoch, who arrived here from Australia." *Id.* Finally, Senator Wirth again indicated that the Amendment was directed at "one individual":

What this issue is about is whether one individual is going to be able to circumvent a clearly laid out set of rules and regulations, whether one individual is going to be able to end-run the intent of the FCC, the intent of Congress; whether one individual, having clearly stated he was going to divest, will be allowed to go back on his word.

*Id.* at S142.

We note that only one Senator made explicit reference to the content of Murdoch's publications. Senator Lowell Weicker, urging that Senator Symms's proposal be tabled, stated:

[A]s one who, by innuendo, has been dragged through the mud by Mr. Murdoch, as one who woke up one morning to read that I had a Communist spy nest in my office because a young intern, unpaid, happened to talk to somebody on the streets of Washington, I can assure you that when it comes to media ownership in the United States, my doubts have nothing to do with his citizenship. I just think he probably is the No. 1 dirt bag owner of any publications or media in this Nation.

*Id.*

The Supreme Court has recently hinted at a readiness to infer censorial intent from legislative history and to invalidate laws so motivated. *Minneapolis Star & Tribune*

*Co. v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 579–80, 103 S.Ct. 1365, 1368–69, 75 L.Ed.2d 295 (1983) (re-examining *Grosjean v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936)). Here the post-enactment debate's exclusive focus on Murdoch, coupled with clues of heated criticism of several senators by Murdoch's papers, *see* 134 Cong.Rec. at S61 (Senator Kennedy notes his past disagreement with *Herald's* editorial board); *id.* at S67 (Senator Wirth states that measure has "nothing to do with the politics of Massachusetts ... [or] editorial cartoons"); *id.* at S143 (Senator Weicker notes *Post's* criticism of him); J.A. at 35, 41, 43, 46, 47, 56, 63 (journalistic references to *Herald's* past criticism of Senator Kennedy), might support such inferences.[12] In view of our conclusion that the Amendment is unconstitutional without concern for motivation (*see* part IV, *infra*), however, we pass over petitioner's claims of illicit purpose.

Whatever the congressional motives, the post-enactment debate reveals but a single focus: whether Rupert Murdoch and News America should be denied the opportunity to seek an extension of his temporary waivers. Taken as a whole, that discussion does nothing to undermine what we learn from the language of the Amendment (coupled with the fact that Murdoch's were the only temporary waivers "current" on December 22, 1987): the clause sought simply to prevent any extension of those waivers.

As we will develop below, the closing 18 words of the Hollings Amendment could not withstand more than "minimum rationality" scrutiny *even* if construed as intervenors propose. But the constitutional discussion should proceed on a realistic basis: the clause impinges on a closed class,[13] consisting exclusively of Murdoch.

**12.** Any judicial use of legislators' remarks for imputing an unconstitutional motive to the legislative majority (as opposed to merely inferring the intended *meaning* of ambiguous legislation) raises troubling questions, *see* Ely, *Legislative and Administrative Motivation in Constitutional Law,* 79 Yale L.J. 1205, 1212–17, 1324–34 (1970), but such imputations occur. *See Edwards v. Aguillard,* —— U.S. ——, 107 S.Ct. 2573, 2579, 96

### III. THE STANDARD OF CONSTITUTIONAL REVIEW

News America contends that we should assess the Hollings Amendment under the daunting standard applied by the Supreme Court in *Arkansas Writers' Project v. Ragland,* —— U.S. ——, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987), and *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983). In *Minneapolis Star,* the state imposed a "use tax" on purchases of ink and paper but exempted the first $100,000 worth, thus restricting the tax to a handful of large newspapers. In *Arkansas Writers' Project,* the state collected a sales tax on general interest magazines, but exempted religious, professional, trade, and sports journals. In both cases the Court held that the exemptions rendered the taxes invalid. In *Minneapolis Star,* the Court said:

Whatever the motive of the legislature in this case, we think that recognizing a power in the State not only to single out the press but also to tailor the tax so that it singles out a few members of the press presents such a potential for abuse that no interest suggested by Minnesota can justify the scheme....

We need not and do not impugn the motives of the Minnesota Legislature in passing the ink and paper tax.... A tax that singles out the press, or that targets individual publications within the press, places a heavy burden on the State to justify its action.

460 U.S. at 591–93, 103 S.Ct. at 1375–76. Similarly, in *Arkansas Writers' Project,* the Court said that "to justify such differential taxation, the State must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." 107 S.Ct. at 1728.

L.Ed.2d 510 (1987); *Wallace v. Jaffree,* 472 U.S. 38, 56–57, 105 S.Ct. 2479, 2490–91, 86 L.Ed.2d 29 (1985). We make no such imputation here.

**13.** *I.e.,* Murdoch is not only the sole current member of the class, but is the sole party that can ever be a member.

The Court, striking both statutes down, analyzed them primarily in First Amendment terms, but in *Arkansas Writers' Project* it expressly noted the overlap with equal protection precepts. 107 S.Ct. at 1726 n. 3 (First Amendment Claims "obviously intertwined with interests arising under the Equal Protection Clause"); *cf. Minneapolis Star*, 460 U.S. at 585–86 n. 7, 103 S.Ct. at 1372 n. 7 (problem viewed as one "arising directly under the First Amendment"). However characterized, the two cases clearly reflect extraordinary concern for any underinclusiveness where speech is at stake.

The FCC contends that such cases are completely inapplicable, and that we must uphold the statutory classification if it is rationally related to some legitimate governmental interest. FCC Brief at 18. Scrutiny under this view is so casual that validity is virtually assured. *See, e.g., Minnesota v. Clover Leaf Creamery*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981); *U.S. Railroad Retirement Board v. Fritz*, 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980); *Williamson v. Lee Optical*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

Insofar as the Commission claims that the broadcast media do not enjoy First Amendment protection identical with the print media, it is plainly correct. *Compare, e.g., Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (requirement that newspapers provide right of reply invalid), *with Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 388, 89 S.Ct. 1794, 1805, 23 L.Ed. 2d 371 (1969) (opposite for broadcasters). *See also FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 799, 98 S.Ct. 2096, 2114, 56 L.Ed.2d 697 (1978); *CBS, Inc. v. FCC*, 453 U.S. 367, 394–96, 101 S.Ct. 2813, 2829–30, 69 L.Ed.2d 706 (1981); *Columbia Broadcasting System v. Democratic National Committee*, 412 U.S. 94, 101–02, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973); *National Broadcasting Co. v. United States*, 319 U.S. 190, 226–27, 63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943); *Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co.*, 289 U.S.

266, 282, 53 S.Ct. 627, 635, 77 L.Ed. 1166 (1933). The Supreme Court has rested this lesser protection on the scarcity of broadcast frequencies "in the present state of commercially acceptable technology" as of 1969, *see Red Lion*, 395 U.S. at 389–90, 89 S.Ct. at 1806–07, and has recognized that new technology may render the doctrine obsolete—indeed, may have already done so. *FCC v. League of Women Voters*, 468 U.S. 364, 376–77 n. 11, 104 S.Ct. 3106, 3115–16 n. 11, 82 L.Ed.2d 278 (1984). But it has stuck to the doctrine in the face of that recognition, expressing unwillingness to reconsider it in the absence of a "signal from Congress or the FCC" as to the impact of advances in broadcast technology. *Id.* Although the Commission itself has emphatically indicted the scarcity theory, *Report Concerning General Fairness Doctrine Obligations of Broadcast Licensees*, 102 F.C.C.2d 143 (1985); *In re Complaint of Syracuse Peace Council*, 1 FCC Rcd 5043 (1987), we will not here speculate on the outcome of any such reconsideration. For purposes of this decision we accept the FCC's contention that broadcast regulations receive more lenient scrutiny than ones affecting other types of speech.

But this conclusion does not take us where the FCC would have us go. The Commission invites us to read *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978) ("*NCCB*"), as establishing the minimum rationality standard for "structural" regulations of the broadcast industry. In that case the Court rejected a constitutional challenge to the very newspaper-broadcast cross-ownership rules from which Murdoch received temporary waivers. It invoked the scarcity concept and upheld the regulations, saying that "nothing in the First Amendment ... prevent[s] the Commission from allocating licenses so as to promote the 'public interest' in diversification of the mass communications media." *NCCB*, 436 U.S. at 799, 98 S.Ct. at 2114. Moreover, the Court rejected newspaper publishers' arguments that the regulations unconstitutionally condi-

tioned receipt of a broadcast license on forfeiture of the established First Amendment right to publish a newspaper. The rules, it observed, allowed publishers to own TV stations in communities different from their papers', were not content-based, and were aimed at the promotion rather than the restriction of free speech. *Id.* at 800–01, 98 S.Ct. at 2114–15.

We do not read *NCCB* as supporting the FCC's broad theory. At no point did the Court expressly rely on any "rational basis" standard or cite a single case applying that standard. In fact, the Court examined the Commission's reasoning with care. The rules were generic in substance as well as form, and the Court considered only a facial challenge. It clearly regarded the rules as manifesting a principled effort to find a mix of ownership-dispersion requirements, on the one hand, and government hands-off, on the other, that would maximize free speech. Given the assumed necessity of the agency's " 'choos[ing] among applicants for the same facilities,' " it wrote, "the Commission has chosen *on a 'sensible basis,'* one designed to further, rather than contravene, 'the system of freedom of expression.' " 436 U.S. at 802, 98 S.Ct. at 2115–16 (emphasis added).

Other cases of the Supreme Court and this court echo this view. In *League of Women Voters* the Court invalidated a section of the Public Broadcasting Act that forbade "editorializing" by any non-commercial public station receiving public funds. Although the Court foreswore insistence on a " 'compelling' governmental interest," it stated that "our decisions have generally applied *a different First Amendment standard* for broadcast regulation than in other areas," 468 U.S. at 375, 104 S.Ct. at 3114 (emphasis added). More affirmatively, the Court stated that while the inherent scarcity of the electromagnetic spectrum allowed for a larger degree of governmental regulation of broadcasting

than for the print media, "broadcasters are engaged in a vital and independent form of communicative activity. As a result, the First Amendment must inform and give shape to the manner in which Congress exercises its regulatory power in this area." *Id.* at 378, 104 S.Ct. at 3116. The upshot was insistence that the restriction be "narrowly tailored to further a substantial governmental interest." *Id.* at 380, 104 S.Ct. at 3118.[14]

The Commission implicitly contends that the sort of review applied in *League of Women Voters* is limited to "non-structural" regulations. Clearly one can array possible rules on a spectrum from the purely content-based (*e.g.,* "No one shall criticize the President") to the purely structural (*e.g.,* the cross-ownership rules themselves). On such a spectrum, the prohibition at issue in *League of Women Voters* would be at some remove from pure content, as it forbade "editorializing" of any kind by the covered stations. 468 U.S. at 366, 104 S.Ct. at 3110. By the same token, the Hollings Amendment is far from purely structural. Indeed, it is structural only in form, as it applies to a closed class of one publisher broadcaster. The Supreme Court in *League of Women Voters* clearly saw no inconsistency with *NCCB*, suggesting that it well recognized ambiguities in the content/structure dichotomy, *cf.* Stone, *Restrictions of Speech Because of its Content: The Peculiar Case of Subject–Matter Restrictions,* 46 U.Chi.L.Rev. 81 (1978), and in this context steered clear of any effort at rigid categorization. Thus, even if we were to accept the Commission's analysis of *NCCB*, we would not agree that the Amendment should be lumped with the cross-ownership rules and accorded the high deference that the Commission believes the latter received. The Amendment can affect but a single party; on any realistic spectrum, it is far closer to the law

14. *See also CBS,* 453 U.S. at 395, 101 S.Ct. at 2829 (broadcasters "entitled under the First Amendment to exercise the widest journalistic freedom consistent with its public [duties]") (quoting *Columbia Broadcasting System,* 412 U.S. at 110, 93 S.Ct. at 2090); *National Broad-casting Co.,* 319 U.S. at 227, 63 S.Ct. at 1014 (government may not "choose among applicants upon the basis of their political, economic or social views, or upon any other capricious basis").

invalidated in *League of Women Voters* than to the regulation sustained in *NCCB*.

Insistence on more than minimal scrutiny finds support in our own past decisions. In *Community–Service Broadcasting v. FCC*, 593 F.2d 1102 (D.C.Cir.1978) (en banc), a case decided soon after *NCCB*,[15] we found a violation of equal protection in certain clearly "structural" rules of the FCC—rules requiring only non-commercial educational broadcast stations to retain audio recordings of broadcasts. Although Judge Robinson believed that the regulations could not withstand even minimal scrutiny and thus found it unnecessary to consider whether a less forgiving test was appropriate, *id.* at 1127, four members of the majority agreed that some form of intermediate scrutiny was appropriate. *Id.* at 1122 (opinion of Judge Wright); *id.* at 1124 (concurring opinion of Judge Bazelon). The court stated that even

> ... where *non content*-based distinctions are drawn in a statute affecting First Amendment rights, the Supreme Court has held that the government interest served must be "substantial" and the statutory classification "narrowly tailored" to serve that interest if the statute is to withstand equal protection scrutiny.

*Id.* at 1122 (emphasis added).

More recently, in *Johnson v. FCC*, 829 F.2d 157 (D.C.Cir.1987), we invoked the First Amendment on both sides of the dispute in upholding the FCC's rule that its equal-time provisions were not triggered when TV stations aired political debates initiated by non-broadcast entities. Judge Robinson, writing for the court, noted that both broadcasters and the public have "important First Amendment interests," *id.* at 161, *see also id.* at 163, and that the Communications Act "reconciles not only competing policy choices, but also interests of constitutional stature in constant tension with each other [there, broadcasters'

speech rights and the ballot access claims of minor-party candidates]." *Id.* at 165. *See also Branch v. FCC*, 824 F.2d 37 (D.C. Cir.1987).

Congress's exclusive focus on a single party clearly implicates values similar to those behind the constitutional proscription of Bills of Attainder. *See* U.S.Const. art. I, § 7, cl. 3. The safeguards of a pluralistic political system are often absent when the legislature zeroes in on a small class of citizens. Justice Jackson's statement, concurring in *Railway Express Agency v. New York*, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949), is a classic:

> The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation.

*Id.* at 112–13, 69 S.Ct. at 466–67. *See also Minneapolis Star*, 460 U.S. at 585, 103 S.Ct. at 1371 (tax that falls only on small segment of press weakens political constraints and suggests motive to suppress information); *Grosjean v. American Press Co.*, 297 U.S. 233, 250–51, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936) (invalidating tax on newspapers that applied only to 13 of 163 newspapers in Louisiana). Nowhere are the protections of the Equal Protection Clause more critical than when legislation singles out one or a few for uniquely disfavored treatment.[16]

---

**15.** The court clearly was aware of *NCCB*, as Judge Robinson cited the Supreme Court's decision in his concurring opinion. *See Community-Service*, 593 F.2d at 1132 n. 64.

**16.** We note that The New York Times Group, although the owner of a newspaper and a radio station in New York, *see* J.A. 125, 130, evidently by virtue of grandfathering, approved the substance of the Hollings Amendment in an editorial, stating that it "forced Rupert Murdoch to sell

We need not go as far as the Supreme Court in *League of Women Voters*, or this court in *Community–Service Broadcasting*, and require a showing that the Amendment's classification is narrowly drawn to serve a substantial governmental interest. What suffices for this case is that more is required than "minimum rationality."

## IV. THE STANDARD APPLIED

 The Hollings Amendment strikes at Murdoch with the precision of a laser beam. We must now inquire how well its aim corresponds with any legitimate public purpose.

The Commission defends the Hollings Amendment as a "rational exercise of legislative authority" in response to a perceived threat to the integrity of the newspaper-television cross-ownership rule. Specifically, the FCC posits that "Congress could have rationally believed that a general prohibition against the extension of temporary waivers is a rational means of ensuring that an applicant for a temporary waiver does not achieve through a successive series of waivers what amounts, in effect, to a permanent waiver." FCC Brief at 30–31. (The reference is only to waivers extant on December 22, 1987, *i.e.*, Murdoch's, as the FCC agrees that only those are covered.) On this view, Congress omitted future waivers from the ban because it anticipated being able to enact some permanent solution before the expiration of the Continuing Resolution.

Measured in terms of this purpose, the Amendment is astonishingly underinclusive. First, the Amendment forbids waiver extensions *only* to News America, not to any other party that might receive a temporary waiver and seek an extension during the fiscal year. If News America sold its Boston station to the *Boston Globe* today, the new owner could seek a temporary waiver and extension. Second, the Hollings Amendment applies only to *extensions* of temporary waivers, not to the granting

of temporary waivers themselves. Thus, a broadcast licensee with four years to run on its license who purchases a newspaper today would be granted an *automatic* temporary waiver of four years, and a publisher purchasing a television station today could be granted a temporary waiver of unspecified duration despite the Amendment. The Amendment imposes no limit at all on the *aggregate duration* of waiver-and-extension combinations (other than Murdoch's). Congress could readily have prevented temporary waivers "creeping" into permanence for forbidding *all* temporary waivers (and capping Murdoch's) or by limiting the aggregate duration of waivers and their extensions.

Thus even intervenors' odd interpretation of the word "current" would not save the Hollings Amendment from this obvious objection—it leaves the Commission free to issue new temporary waivers far longer than Murdoch's. This is a sort of anti-grandfathering; we know of no public policy interest in its favor and no party to this proceeding suggests one.

In short, every publisher in the country other than Murdoch can knock on the FCC's door and seek the exercise of its discretion to secure, either by a single temporary waiver or by a waiver coupled with an extension, a period of exemption from the cross-ownership restrictions *longer* than that to which News America is restricted as a matter of law. Congress's device bears only the most strained relationship to the purpose hypothesized by the Commission.

We are perplexed by the suggestions on the floor of the Senate, in the post-enactment discussion of the Amendment (*see supra* pp. 807–809), that Murdoch was seeking unique treatment or a permanent waiver. In this proceeding he has clearly sought only an extension of a temporary waiver, and no one has directed our attention to any application for a permanent waiver. Prior to the Hollings Amendment, there appears to have been nothing unique

two newspapers, reinforcing sound federal policy." *See* "Congress: Wrong Even When Right,"

N.Y. Times, Jan. 6, 1988, at A22, col. 1.

about either the status of Murdoch's temporary waivers or of his potential eligibility for extensions. It is only the Amendment that treats him uniquely; all other applicants may apply for—and presumably, on a sufficient showing, receive—exemption for longer periods.

We note that Congress imposed the restriction solely on extensions of waivers of the newspaper-*television* rules, not of the newspaper-radio rules as well. Three temporary waivers of the newspaper-radio rules are currently outstanding, and all three waivers have been extended pending the outcome of an FCC rulemaking proceeding. *See* J.A. at 29. The Supreme Court has already sustained the Commission's distinction between radio and television for purposes of other aspects of the cross-ownership rules, *see NCCB*, 436 U.S. at 815, 98 S.Ct. at 2122, on the basis of TV's much greater importance as a source of news. This omission alone would thus not undermine the Hollings Amendment, as it may rest on sound and well-recognized public policy concerns. It does, however, emphasize the narrowness of the Amendment's focus.

Of course Congress ordinarily need not address a perceived problem all at once. *See, e.g., City of New Orleans v. Dukes*, 427 U.S. 297, 305, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976); *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 813, 96 S.Ct. 2488, 2499, 49 L.Ed.2d 220 (1976); *Williamson*, 348 U.S. at 488, 75 S.Ct. at 464. But courts reject the facile one-bite-at-a-time explanation for rules affecting important First Amendment values. *League of Women Voters*, 468 U.S. at 396, 104 S.Ct. at 3126 (underinclusiveness as basis for striking down ban on editorializing); *Community–Service Broadcasting*, 593 F.2d at 1122; *see also Arkansas Writers' Project*, 107 S.Ct. at 1730; *Minneapolis Star*, 460 U.S. at 592, 103 S.Ct. at 1375. Moreover, contrary to the assertions of FCC counsel at oral argument, Murdoch and News America were more than mere "catalysts" for congressional action aimed at a perceived evil. Here "evil" and "catalyst" overlap completely; the only "evil" that the Amendment scotched was the possibility that Murdoch might get extensions. In these circumstances, we think the Amendment's underinclusiveness fatal.

## V. CONCLUSION

Congress has denied a single publisher/broadcaster the opportunity to ask the FCC to exercise its discretion to extend its waivers. The sole apparent difference between that publisher/broadcaster and all other possible applicants is an accident of timing: its temporary waivers were in effect on December 22, 1987, the others will have been issued thereafter. Further, only News America's aggregate waiver periods are limited to 18 months and two years; all other future grants are free of any such time limit. Whatever Congress's motive, the "potential for abuse" of First Amendment interests is so great in such restrictions, *cf. Minneapolis Star*, 460 U.S. at 592, 103 S.Ct. at 1375, that a bland invocation of Congress's conventional power to approach a problem one step at a time cannot sustain the Amendment.

We vacate the Commission's order in this case and remand to the Commission for consideration of News America's petition in light of the standards and principles that it has hitherto applied. As we observed above, the Supreme Court in sustaining the cross-ownership rules against First Amendment attack found that their "reasonableness" was "underscored" by the availability of waivers where the station and newspaper "cannot survive without common ownership." *NCCB*, 436 U.S. at 802 n. 20, 98 S.Ct. at 2115 n. 20. Thus, whether or not the waiver process is constitutionally compelled, First Amendment values are implicated in the process and require even-handed treatment of all applicants. We do not, of course, express any opinion as to whether News America is entitled to an extension of its remaining waiver. But we cannot help noticing that removal of the legislative bar on consideration of News America's application will leave in place the "intense political ... pressure from Congress," *Meredith*, 809 F.2d at 872, that gave rise to the Amendment itself. That pressure must, of course, play no role in agency adjudications involving important

constitutional rights. *Cf. Pillsbury Co. v. FTC,* 354 F.2d 952, 964–65 (5th Cir.1966) (adjudicative decision made under intense congressional pressure "sacrifices the appearance of impartiality" and requires that the resulting order be vacated).

*Vacated and Remanded.*

SPOTTSWOOD W. ROBINSON, III, Circuit Judge, dissenting:

A congressional focus as narrow as that indicated by the Hollings Amendment[1] naturally arouses suspicions about its legal propriety and counsels a reviewing court to examine it closely. Nonetheless, under our constitutional scheme, the Amendment is entitled to even-handed testing under the standard of review appropriate.[2] My colleagues, purporting to subject the Amendment to a level of scrutiny characterized as something more than minimum rationality,[3] strike the law down.[4] I believe, however, that if that standard were properly applied, the Amendment would stand.

## I

In evaluating the enactment at issue, we must assess the Government's interest in the legislation and ascertain the extent to which the means chosen advance that interest.[5] We cannot hold a federal statute unconstitutional merely because Congress could have done better; our role is to determine only whether Congress did well enough.

The Commission adopted the newspaper-broadcast cross-ownership rules[6] in 1975.[7] By limiting common ownership of broadcast facilities and daily newspapers in the same community, the Commission sought to promote diversity of program and service viewpoints, a policy grounded primarily in the First Amendment.[8] Over time the Commission's position on the rule has shifted, and there have been indications that the Commission may favor revision or outright repeal of the rule.[9] In November, 1987, the Freedom of Expression Foundation petitioned the Commission for rulemaking to eliminate the newspaper-broadcast cross-ownership rule, and the Commission put the petition out for public comment.[10]

On December 22, 1987, Congress enacted a continuing resolution appropriating funds

1. Pub.L. No. 100–202, 101 Stat. 1329 (1987).

2. See *City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Daniel v. Family Sec. Life Ins. Co.,* 336 U.S. 220, 225 n. 5, 69 S.Ct. 550, 553 n. 5, 93 L.Ed. 632, 637 n. 5 (1949); *Fort Smith Light & Traction Co. v. Board of Improvement,* 274 U.S. 387, 391, 47 S.Ct. 595, 597, 71 L.Ed. 1112, 115 (1927); see also *Maine Cent. R.R. v. Brotherhood of Maintenance of Way Employees,* 813 F.2d 484 (1st Cir.1987) (legislative classification that encompasses only one specific entity is not necessarily irrational or unconstitutional). In *Nixon v. Administrator,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Supreme Court noted that an equal protection challenge likely would have failed although the legislation there addressed could affect only one person, who was specifically named. "[M]ere underinclusiveness," the Court said, "is not fatal to the validity of a law under the equal protection component of the Fifth Amendment ... even if the law disadvantages an individual or identifiable members of a group." *Id.* at 471 n. 33, 97 S.Ct. at 2804 n. 33, 53 L.Ed.2d at 908 n. 33 (citations omitted).

3. Majority Opinion (Maj.Op.) at 802, 814.

4. *Id.* at 815.

5. This is true whether the correct standard is existence of a rational basis, see, e.g., *Mathews v. Lucas,* 427 U.S. 495, 508 n. 14, 96 S.Ct. 2755, 2763 n. 14, 49 L.Ed.2d 651, 662 n. 14 (1976), or the higher standard applied in *FCC v. League of Women Voters,* 468 U.S. 364, 380, 104 S.Ct. 3106, 3118, 82 L.Ed.2d 278, 292 (1984).

6. 47 C.F.R. § 73.3555(c) (1987).

7. See *Second Report & Order,* 50 F.C.C.2d 1046 (1975).

8. *Id.* at 1048–1049; see notes 16–19 *infra* and accompanying text.

9. In fact, the Commission's brief in this court states:

 This is not to say that, in the Commission's view, continuing the ban on newspaper/television cross-ownership for another year is necessarily good public policy. Indeed, had Congress not provided otherwise, the Commission might have concluded that the present rule against newspaper/television cross-ownership should have been reviewed to determine whether it continued to serve the public interest.

 Brief for Appellee at 16; see note 25 *infra.*

10. Public Notice Rep. No. 1695 (Nov. 30, 1987).

for operation of the Federal Government during fiscal year 1988.[11] One portion of the resolution, referred to as the Hollings Amendment, spoke to the cross-ownership rule through a proviso

> that none of the funds appropriated by this Act or any other Act may be used to repeal, to retroactively apply changes in, or to begin or continue a reexamination of the rules of the Federal Communications Commission with respect to the common ownership of a daily newspaper and a television station where the grade A contour of the television station encompasses the entire community in which the newspaper is published, *or to extend the time period of current grants of temporary waivers to achieve compliance with such rules.*[12]

The Hollings Amendment reflected the reaction of Congress to what it perceived as the threatened erosion, if not eradication, of the newspaper-broadcast cross-ownership rule.[13] The case at bar involves only the last clause of the Amendment, which forbids the Commission from granting extensions of temporary waivers that were in effect when the continuing resolution was passed. Congress recognized the distinct possibility that through indefinite or successive extensions of a temporary waiver, the Commission could grant the equivalent of a permanent waiver without any showing that the heavy burden of justifying such a waiver had been met.[14] The final clause of the Amendment affects a class of only one because News America Publishing, Inc. (News America), the appellant, was the only entity holding temporary waivers on the effective date of the legislation.[15]

## II

In analyzing the congressional purpose in enacting the Hollings Amendment, the First Amendment considerations underpinning the cross-ownership rule cannot be ignored. In *FCC v. National Citizens Committee for Broadcasting (NCCB)*,[16] the Supreme Court upheld the rule against a facial attack, declaring that the First Amendment is served by achieving " 'the widest possible dissemination of information from diverse and antagonistic sources.' "[17] "[F]ar from seeking to limit the flow of information," the Court explained, "the Commission has acted ... 'to enhance the diversity of information heard by the public without on-going government

11. Pub.L. No. 100–202, 101 Stat. 1329 (1987).

12. Making Further Continuing Appropriations for the Fiscal Year Ending September 30, 1988, H.R.Rep. No. 498, 100th Cong., 1st Sess. 34 (1987) (emphasis added).

13. See 134 Cong.Rec. S63 (daily ed. Jan. 26, 1988) (statement of Sen. Hollings) (proviso serves to ensure that the rule will not be evaded by successive grants of temporary waivers); *Id.* at S59 (statement of Sen. Kennedy) (proviso designed to preserve cross-ownership rule against attempts to obtain permanent exemption in guise of series of temporary waivers). In identifying the underlying purpose of the Amendment, the statements of Senator Hollings, sponsor of the Amendment, and Senator Kennedy, who provided primary impetus for it, must be given weight, particularly in the absence of a more complete legislative history. See, e.g., *Lewis v. United States*, 445 U.S. 55, 63, 100 S.Ct. 915, 919, 63 L.Ed.2d 198, 207–208 (1980) ("[i]nasmuch as Senator Long was the sponsor and floor manager of the bill, his statements are entitled to weight"); *Simpson v. United States*, 435 U.S. 6, 13, 98 S.Ct. 909, 913, 55

L.Ed.2d 70, 77 (1978) ("[a]lthough [a Congressman's] remarks are of course not dispositive of the issue of [the statute's] reach, they are certainly entitled to weight, coming as they do from the provision's sponsor"). Furthermore, these statements comport with the legislative purpose posited by the Commission. See Brief for Appellee at 30–31.

14. See note 13 *supra; see also* Brief for Appellee at 30–31. According to the Commission, "it is clear that the burden of showing that a permanent waiver is warranted is extremely high—and considerably higher than that for a temporary waiver." *Id.* at 27; see *Health & Medicine Policy Research Group v. FCC*, 257 U.S.App.D.C. 123, 127–128, 807 F.2d 1038, 1042–1043 (1986).

15. See Brief for Appellee at 13.

16. 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978).

17. *Id.* at 799, 98 S.Ct. at 2114, 56 L.Ed.2d at 716 (quoting *Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424–1425, 89 L.Ed. 2013, 2030 (1945)).

surveillance of the content of speech'"; [18] the cross-ownership rule thus was "designed to further, rather than contravene, 'the system of freedom of expression.'" [19] Consequently, when Congress's purpose in enacting the Hollings Amendment is assessed, it must be acknowledged that preservation of the cross-ownership rule will promote First Amendment values. And it goes without saying that this factor adds substantial weight to the governmental interest in this legislation.

Furthermore, the congressional endeavor over time to maintain the integrity of the cross-ownership rules has been intense, as has been its concern about abuse of the waiver process. Hearings in July, 1985, before the House Subcommittee on Telecommunications, Consumer Protection and Finance explored, among other things, the Commission's policy on waivers of those rules.[20] The Subcommittee's effort to ascertain the rigor with which the Commission would evaluate applications therefor drew a response by the Commission's chairman that only a "compelling case" would justify a waiver.[21] In November of 1985, however, the Subcommittee found it necessary to admonish the Commission's chairman to live up to his earlier representations by tightening the standards for granting temporary waivers.[22] The Subcommittee reemphasized its position: "As you are well aware, we firmly believe that the cross-ownership rules are vitally important in protecting competition and diversity in the marketplace of ideas and that waivers to those rules should be viewed as an extraordinary, not an ordinary, action." [23]

18. *NCCB, supra* note 16, 436 U.S. at 801–802, 98 S.Ct. at 2115, 56 L.Ed.2d at 718 (quoting *National Citizens Comm. for Broadcasting v. FCC,* 181 U.S.App.D.C. 1, 17, 555 F.2d 938, 954 (1977)).

19. *NCCB, supra* note 16, 436 U.S. at 802, 98 S.Ct. at 2115–2116, 56 L.Ed.2d at 719 (quoting T. Emerson, The System of Freedom of Expression 663 (1970)). One of the premises of the decision in *NCCB* was that broadcast regulation is justified at least in part by spectrum scarcity. 436 U.S. at 799, 98 S.Ct. at 2114, 56 L.Ed.2d at 716–717. Although this rationale has been criticized because of changes in television technology, the Supreme Court has refused to abandon it absent guidance from Congress or the Commission. *FCC v. League of Women Voters, supra* note 5, 468 U.S. at 376–377 n. 11, 104 S.Ct. at 3115 n. 11, 82 L.Ed.2d at 289 n. 11.

20. *Media Mergers and Takeovers: the FCC and the Public Interest, Hearings Before the Subcomm. on Telecommunications, Consumer Protection and Finance of the House Comm. on Energy and Commerce,* 99th Cong., 1st Sess. (1985), *reprinted in part in* 134 Cong.Rec. S65 (daily ed. Jan. 26, 1988).

21. MR. FOWLER. I think generally we ought not to grant waivers unless a compelling case is shown which demonstrates that a waiver would either not disserve the purpose of the rule and would serve other important public policy goals or that it would serve the purpose of that rule by having granted a waiver. I am generally, though, however, against a policy of liberally granting waivers for two reasons: one, I think it is very poor administrative law; and two, once you do that, I think it is difficult to justify not having to grant other waivers in similar circumstances.

\* \* \* \* \* \*

MR. WIRTH. It seems to me that there is an important consideration here in terms of again the standards and criteria that you are using on this front. And it is my concern—and you and I have talked about this in the past—that we underline, underscore, and emphasize to people the importance of concentration and cross-ownership, which is the thrust of what I am getting at. And I would hope that you all, in looking at this, make very clear to the applicants our mutual concern about this and the fact that this is not something that is going to go away. It is not going to disappear as some think it may, and that this is an important concern, and to be as strong and clear about that as possible.

MR. FOWLER. We totally agree, Mr. Chairman.

*Id.*

22. Letter from House of Representatives, Subcommittee on Telecommunications, Consumer Protection and Finance of the Committee on Energy and Commerce, to Mark S. Fowler (Nov. 13, 1985), *reprinted in* 134 Cong.Rec. S65 (daily ed. Jan. 26, 1988).

23. *Id.* The Subcommittee's letter further stated:

While temporary waivers may be justified in cases where clear public policy justifications exist, we are very disturbed by the Commission's apparent attitude that temporary waivers are justified solely upon mere allegations that possible financial hardship or distress sales would result if property cannot be disposed of in what has been termed an "orderly" fashion. Clearly, this attitude is nothing more than an open invitation for parties to seek temporary waivers with an expectation that they be routinely, if not automatically, granted.

Later that year, the subject was again addressed, this time in the Conference Report on the continuing resolution funding governmental operations for fiscal year 1986:

> The conferees are concerned with Commission enforcement of the local cross-ownership rules particularly in light of the number of recent waiver requests to these rules the Commission has considered. The Commission's purpose in granting any waiver to the cross-ownership rules should be to further the public interest; furtherance of the private interest of any applicant or licensee must be subservient to this purpose.
>
> The conferees expect the Commission to review such requests with great scrutiny and not grant a waiver unless the applicant meets the burden of clearly demonstrating why such a waiver should be granted. Any temporary waiver

granted should be limited in duration to the minimum amount of time necessary.[24]

Congress thus had a well documented interest in preserving the cross-ownership rules and in ensuring appropriately limited use of the waiver process. But when, at the close of 1987, Congress took up the continuing resolution for fiscal year 1988, that interest was threatened. Pending at the Commission was a petition for rulemaking seeking revision or repeal of the rule. There was evidence that the Commission no longer supported the rule.[25] There was ground, too, for apprehension that the Commission would grant unjustifiably a waiver extension to News America, thereby circumventing the rule.[26]

## III

Congress enacted the Hollings Amendment to forestall evisceration of the cross-

---

> \* \* \* \* \* \*
>
> By your own words [in previous subcommittee testimony], an applicant who seeks a temporary waiver must carry the burden of presenting a compelling case which demonstrates all of the facts that would justify such a waiver, "[a]nd if they do not make that case, they will not be granted any kind of a waiver."
>
> It is one thing for a regulatory agency created by Congress to disagree with the Congress over the direction of policy, as you have done on a number of previous occasions. It is quite another for you to come before the Congressional committee responsible for overseeing your agency and make commitments as to how you will exercise your responsibility under the Communications Act and then not give [sic] up to those commitments either in letter or spirit.
>
> Id.

24. H.R.Rep. No. 453, 99th Cong., 1st Sess. 433 (1985), *reprinted in* 134 Cong.Rec. S57 (daily ed. Jan. 26, 1988).

25. See note 9 *supra* and accompanying text. Senator Hollings' statements on the floor of Congress indicate apprehension regarding the Commission's position on the rule. It "has been open season over there," he said, "in getting rid of nearly any kind of rule and regulation." 134 Cong.Rec. S56 (daily ed. Jan. 26, 1988). Regarding the deregulatory tendencies of the Commission, the Senator stated that "we have, time and again, set forth admonitions and the FCC has in turn done exactly the opposite." *Id.* "I am trying to catch a runaway Federal Communications Commission. They have been the

ones who have been edging to not just another waiver but permanent repeal." *Id.* at S57.

26. News America's petition for an extension of its waiver rested primarily on pendency of the petition for new rulemaking on cross-ownership. See Petition of News America Publishing, Incorporated, for Extension of Waiver, Joint Appendix A 1. News America requested an extension until the expiration of six months following the Commission's action on that petition. *Id.* The debate over repeal of the Hollings Amendment reveals that Congress may have believed that the Commission was inclined to treat News America more favorably than other applicants. Senator Hollings noted a statement made by the outgoing chairman of the Commission at his retirement party: "The greatest gift I gave to anybody as Chairman of the FCC was an 18-month waiver to Rupert Murdoch." 134 Cong.Rec. S58 (daily ed. Jan. 26, 1988). Senator Hollings commented, "and everybody clapped and said 'Whoopee.' That is the way we are doing business—cash and carry downtown at the Federal Communications Commission." *Id.* Senator Kennedy stated that "Mr. Murdoch is one of the most powerful publishers in the world, and he has been using those powers to ignore the will of Congress, subvert the FCC, and evade the cross-ownershaip rule." *Id.* at S59. Senator Kennedy declared that "we have also learned the hard way to be skeptical about whether the FCC is willing to stand up to him and apply the same rules to him that it applies to everyone else," *id.* at S60, and that "[t]he agency had been captured lock, stock, and barrel by Rupert Murdoch, and it was long past time for Congress to step in," *id.* at S61.

ownership rule. To effect this purpose, one of the means chosen, among others, was to bar the Commission from extending the duration of extant temporary waivers. My colleagues do not characterize the congressional goal as inappropriate or insubstantial, as well they should not. Rather, they fault the Amendment because, they claim, the method used "bears only the most strained relationship" to the asserted purpose.[27]

I am unable to agree. If the aim is to preserve the cross-ownership rule, and waiver extensions endanger the rule, then a prohibition on extensions of waivers—albeit only current ones—does serve the purpose. Far from being "strained," the relationship between means and end is decidedly strong. There cannot be any doubt that the fit between purpose and method in this case is more than close enough to satisfy a test of minimum rationality. The question then becomes whether the means-end relationship is sufficient to satisfy the slightly higher standard of review applicable here—something more than minimum rationality.

I agree with my colleagues that in ascertaining the standard of review to apply, "we need not go as far as the Supreme Court in *FCC v. League of Women Voters*."[28] My view, however, does not accord with my colleagues' statement that this case "is far closer to the law invalidated in *League of Women Voters* than to the regulation sustained in *NCCB*."[29] *League of Women Voters* featured a challenge to Section 399 of the Public Broadcasting Act of 1967,[30] which forbade any noncommercial educational station receiving a grant from the Corporation for Public Broadcasting to "engage in editorializing."[31] The Court emphasized, in determining the proper standard of review, that "Section 399 plainly operates to restrict the expression of editorial opinion on matters of public importance, and, as we have repeatedly explained, *communication of this kind is entitled to the most exacting degree of First Amendment protection*."[32] Because *League of Women Voters* arose in the broadcast context, where "strict scrutiny" review is inappropriate,[33] the Court required the legislation to be "narrowly tailored to serve a substantial governmental interest."[34] The case at bar is significantly distinct. Congress has blocked News America's access to the Commission only for the purpose of requesting an extension of the waiver it presently enjoys. That is a far cry from the content-focused restriction involved in *League of Women Voters*, which outlawed a particular type of highly valued speech.[35] The *League of*

27. Maj.Op. at 814.

28. *Id.* at 814; see *FCC v. League of Women Voters, supra* note 5, 468 U.S. at 380, 104 S.Ct. at 3118, 82 L.Ed.2d at 292.

29. Maj.Op. at 812–813.

30. 47 U.S.C. §§ 390–399 (1982 & Supp.III 1985).

31. *Id.* § 399.

32. 468 U.S. at 375–376, 104 S.Ct. at 3115, 82 L.Ed.2d at 289 (emphasis added).

33. *Id.* at 376, 104 S.Ct. at 3115, 82 L.Ed.2d at 289.

34. *Id.* at 380, 104 S.Ct. at 3118, 82 L.Ed.2d at 292.

35. Similarly, I believe we are at some distance from the scenario in *Community–Service Broadcasting, Inc. v. FCC,* 192 U.S.App.D.C. 448, 593 F.2d 1102 (*en banc* 1978). The provision there in controversy required all noncommercial educational stations receiving federal funding to make audio recordings of all broadcasts "in which any issue of public importance is discussed," and to provide a copy upon request to any member of the Commission or the public. See Pub.L. No. 93–84, § 2, 87 Stat. 219 (1973). We deemed this command an obstacle to free expression. First, it was not on its face content neutral, 192 U.S.App.D.C. at 457, 593 F.2d at 1111; indeed, the fact that it regulated only programming concerning issues of public importance indicated "a government purpose intentionally and impermissibly to restrict free speech on the basis of its content," *id.* at 458, 593 F.2d at 1112. Additionally, we found that the legislative history supported the conclusion "that the purpose of the recording requirement was related to suppression of free expression on issues of public importance." *Id.* As Judge Bazelon noted in his concurring opinion, the statute "not only 'touches upon' fundamental First Amendment freedoms, but does so by classifications formulated explicitly in terms of the content of speech." *Id.* at 470, 593 F.2d at 1124. Therefore, while heightened scrutiny may have been appropriate in *Community–Service*, the restriction presented in the case before us is unaccompanied by any similar need for that stan-

*Women Voters* standard of review is unsuitable here.

Despite a claim to the contrary,[36] it appears to me that my colleagues have, in essence, used a standard equivalent to that applied in *League of Women Voters.* I think it inappropriate to focus solely on alternatives that Congress conceivably could have chosen rather than analyze the adequacy of what Congress actually did. Our task as judges is simply to look for something more than a rational relationship between the Government's purpose and the means employed to achieve it. If the method is substantially related to the Government's interest—a somewhat higher level of inquiry than mere rational relationship—the legislation should survive. A substantial relationship does exist in this case, and an examination of the majority's objections to the Hollings Amendment makes that clear.

## IV

My colleagues hold the Amendment unconstitutional because they find it underinclusive in two respects. First, they fault the enactment because it proscribes grants of waiver extensions to News America, the only holder of "current" waivers,[37] but "not to any other party that might receive a temporary waiver and seek an extension *during the fiscal year.*"[38] In other words, "[i]f News America sold its Boston station to the *Boston Globe* today, the new owner could seek a temporary waiver and extension," whereas News America could not.[39]

Although that is literally true, as a practical matter it ignores reality. In the past, initial waivers bestowed by the Commission have ranged from eighteen months to three years,[40] and no requests for initial waivers are now pending;[41] consequently, any hypothetical extension request is a long way off. Not only do these "future" waivers present no immediate threat, but Congress is free to anticipate a permanent solution before they ever would.[42] To be sure, Congress could have brought future waivers within the purview of the Amendment, but that is not to say that its failure to do so renders this enactment unconstitutional. Rather, Congress may deal with immediate threats as they arise.[43]

Second, my colleagues find the Amendment underinclusive because it "applies only to *extensions* of temporary waivers, not to the granting of temporary waivers themselves."[44] Put another way, theoretically an unextended temporary waiver could endure longer than a temporary waiver that has been extended. This argument strikes me as even more curious than the first. The suggestion is that Congress could either have forbidden all temporary waivers or limited the aggregate duration of waivers plus extensions.[45] That reasoning, it seems to me, misses the point, for it is not the length of the waiver alone that subverts the cross-ownership rule. Rather, the larger problem is the potential conversion of something temporary into something perpetual without meeting the higher standards for permanent waivers.[46]

dard of review. There is no content discrimination here. There is only an attempt by Congress to force compliance with a structural rule it considers of great importance. Accordingly, there is no basis for equating this case with *Community–Service.*

36. Maj.Op. at 813–814.

37. See *id.* at 805.

38. *Id.* at 814 (emphasis added).

39. *Id.*

40. Brief for Appellee at 34 n. 19.

41. *Id.* at 32 n. 16.

42. See Maj.Op. at 814; Brief for Appellee at 34–35.

43. E.g., *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 813, 96 S.Ct. 2488, 2499, 49 L.Ed.2d 220, 233 (1976); *Katzenbach v. Morgan,* 384 U.S. 641, 657, 86 S.Ct. 1717, 1727, 16 L.Ed.2d 828, 839 (1966); *Williamson v. Lee Optical,* 348 U.S. 483, 488–489, 75 S.Ct. 461, 465, 99 L.Ed. 563, 573 (1955).

44. Maj.Op. at 814.

45. *Id.*

46. See note 14 *supra.* Furthermore, any single waiver of fixed duration, by its nature, will not extend indefinitely. Surely it would be difficult

A ban on all temporary waivers likely would raise more problems than it would solve and, more importantly, it would not address the kind of circumvention of the rule with which Congress was concerned. Moreover, because the necessity of a waiver and the length appropriate will vary from case to case, a ceiling on the aggregate duration of waivers plus extensions may not have been a prudent alternative. Temporary waivers are intended to provide a reasonable opportunity for orderly divestiture of the newspaper or the broadcast property.[47] Congress could logically conclude that one waiver of specified duration would be sufficient to achieve that goal,[48] and that extensions of waivers could undermine that purpose, for example, by giving owners an incentive to postpone or avoid divestiture in order to become eligible for an extension when the original waiver expired.

Because of News America's unique status as the only holder of a current waiver, it was the only entity affected by the Hollings Amendment. There is no content discrimination here.[49] And, although it may be easy to hypothesize other means by which Congress could have sought to achieve its objectives, the existence of alternatives does not necessarily render the chosen method unconstitutional. When the standard of review to be applied is strict scrutiny, courts have a tendency, appropriate in such cases, to define the Government's interest very precisely and narrowly. Because the countervailing interest is of such extreme importance, courts expect exactitude and compelling justification from the legislature, and give it little if any benefit of the doubt. But the test purportedly applied in this case is not even an "intermediate" standard of review; it simply is something more than minimum rationality. Courts must take care to ensure

for the Commission in good faith to grant a "temporary" waiver of any duration that could be considered permanent.

**47.** See, e.g., *Health & Medicine Policy Research Group v. FCC, supra* note 14, 257 U.S.App.D.C. at 127–128, 807 F.2d at 1042–1043; *Second Report & Order, supra* note 7, at 1047, 1085.

**48.** At the time the rules were adopted, the Commission stated, "we do not contemplate permanent waiver[s], for problems in disposing of these interests would not be expected to endure indefinitely." *Second Report & Order, supra* note 7, at 1084 n. 46.

**49.** As my colleagues acknowledge, their lengthy recitation of the debate on the suggested repeal of the Hollings Amendment serves merely to discern the intended meaning of the statutory language. Maj.Op. at 810 & n. 12. That discussion gives no basis for imputing an improper motive to Congress; in fact, it does quite the opposite. There is no evidence during the debate that Congress was endeavoring to censor Murdoch because of his views, as distinguished from his tactical approach to an extension. Rather, Congress was merely trying to ensure compliance with a rule it prized highly, a perfectly legitimate motive and concern. The sole question for decision is whether the means Congress used to address that concern falls within constitutional parameters.

Furthermore, I take issue with the majority's characterization of the Supreme Court's reexamination of *Grosjean v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), as set forth in *Minneapolis Star & Tribune Co. v. Com-*

*missioner,* 460 U.S. 575, 579–580, 103 S.Ct. 1365, 1368–1369, 75 L.Ed.2d 295, 301 (1983). See Maj.Op. at 809 ("[t]he Supreme Court has recently hinted at a readiness to infer censorial intent from legislative history and to invalidate laws so motivated"). First, the few equivocal statements pulled from the legislative debates to support this proposition are sorely inadequate to support an inference of improper purpose in this case, to the extent that such is an appropriate judicial inquiry. A fair reading of the Congressional Record fully supports the interpretation that this Amendment's objective was to preserve a rule that Congress valued highly, not to censor speech. This is quite unlike *Grosjean,* where a United States Senator and the Governor of Louisiana had distributed a circular to all members of the state legislature, describing the " 'lying newspapers' as conducting 'a vicious campaign' and the tax as 'a tax on lying, 2¢ a lie.' " *Minneapolis Star & Tribune Co. v. Commissioner,* 460 U.S. at 579–580, 103 S.Ct. at 1369, 75 L.Ed.2d at 301. There is no comparable evidence of illicit purpose in this case. In addition, the Court has stressed the hazards of basing a finding of unconstitutionality on legislative motive that is assertedly unseemly. See, e.g., *United States v. O'Brien,* 391 U.S. 367, 382–385, 88 S.Ct. 1673, 1682–1684, 20 L.Ed.2d 672, 683–685 (1968). Accordingly, I would be extremely hesitant, on the basis of the Court's single statement in *Minneapolis Star,* to read this doctrine into constitutional law, particularly in light of the majority's acknowledgement that its discussion of the matter is dicta and irrelevant to the decision in this case. See Maj.Op. at 809–810 & n. 12.

that they do not in effect engage in strict or intermediate scrutiny when the applicable standard of review demands less.[50]

## V

In my view, Congress pursued a wholly legitimate purpose when it acted to protect the cross-ownership rule from circumvention or erosion. Because of the First Amendment foundation that underlies the rule, the congressional action at issue here was designed to promote constitutional values. By forbidding the Commission from extending current grants of temporary waivers, Congress selected a method that was more than adequately related to the purpose it sought to achieve. Because I believe this enactment withstands constitutional scrutiny, I respectfully dissent.

**50.** There are indications that my colleagues have done just this. For example, they recognize the rule that "Congress ordinarily need not address a perceived problem all at once." Maj.Op. at 815. Nonetheless, they give that rule short shrift on the basis of four cases, all of which use a standard of review higher than that conceded to be applicable in this case. *Id.*