# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 23, 2010　　　　Decided June 14, 2011

No. 10-5213

AMERICAN BUS ASSOCIATION,
APPELLEE

v.

PETER M. ROGOFF, ADMINISTRATOR, FEDERAL TRANSIT
ADMINISTRATION AND FEDERAL TRANSIT ADMINISTRATON,
APPELLANTS

———

Consolidated with 10-5214

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:10-cv-00686)

———

　　　*Lewis Yelin*, Attorney, U.S. Department of Justice, argued
the cause for appellants.　With him on the briefs were *Tony
West*, Assistant Attorney General, and *Scott R. McIntosh*,
Attorney; *Ronald C. Machen*, U.S. Attorney; and *R. Craig
Lawrence*, *Diane M. Sullivan*, and *Lauren J. Karam*, Assistant
U.S. Attorneys.

2

*Richard P. Schweitzer* argued the cause for appellee American Bus Association. With him on the briefs was *Craig M. Cibak*.

*Dan R. Mastromarco* argued the cause for appellee United Motorcoach Association, Inc. With him on the brief was *David R. Burton*.

Before: GARLAND and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: This appeal raises the following question: Can Congress constitutionally permit a federally-subsidized transit system to take the residents of Seattle out to the ball game? We conclude that Congress can, and we therefore reject the plaintiffs' challenge to a Washington Senator's effort to help her constituents get to Seattle Mariners games.

I

The Federal Transit Act provides that, as a condition of receiving federal funding, a public transportation system must agree not to "provide charter bus transportation service outside the urban area in which [the system] provides regularly scheduled public transportation service." 49 U.S.C. § 5323 (d)(1). This provision is known as the "Charter Rule." The Act further provides that, "[o]n receiving a complaint about a violation of [such an agreement], the Secretary [of Transportation] shall investigate and decide whether a violation has occurred." *Id.* § 5323(d)(2)(A). "If the Secretary decides that a violation has occurred, the Secretary shall correct the violation under terms of the agreement." *Id.* § 5323(d)(2)(B).

The Transit Act authorizes the Secretary of Transportation to issue implementing regulations, *id.* § 5334(a)(11), which authority the Secretary has delegated to the Federal Transit Administration (FTA), 49 C.F.R. § 1.51(g). The FTA, in turn, has promulgated regulations that allow interested parties to request advisory opinions regarding the Charter Rule, as well as orders to cease and desist from violations of that Rule. *Id.* § 604.17. The regulations also permit interested parties to file complaints "regarding the provision of charter service by a recipient" of federal financial assistance. *Id.* §§ 604.25, .27. The FTA may then conduct an investigation, and if it determines that a violation of the Charter Rule has occurred, it may (inter alia) bar the offending transit system from receiving future federal funding. *Id.* § 604.47(a)(1). A party dissatisfied with the FTA's determination may file a petition for judicial review under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06. *See* 49 C.F.R. § 604.50(a).

Although the Transit Act's Charter Rule dates to 1973, Seattle's public transportation system, King County Metro (KCM), began providing special local bus service to Seattle Mariners baseball games in the late 1990s and continued this service for more than a decade. In 2008, the FTA issued a regulation clarifying that the "charter service" barred by the Transit Act includes irregularly scheduled bus service to special events, including baseball games. 49 C.F.R. § 604.3(c)(2); *see* 73 Fed. Reg. 44,933 (2008). Because KCM's special buses qualified as "charter service" under the regulation, KCM could no longer provide the buses without jeopardizing its federal funding.[1] In March 2008, KCM successfully petitioned the FTA

---

[1]Although the Transit Act itself bars only "transportation service *outside* the urban area in which [the transit system] provides regularly scheduled public transportation service," 49 U.S.C. § 5323(d)(1) (emphasis added), the implementing regulations apply to all charter

for an exception to the Charter Rule for the 2008 baseball season. United Motor Coach Association (UMA) filed suit challenging the exception, but that suit was mooted when the 2008 season ended and the exception expired. *United Motor Coach Ass'n v. Welbes*, 614 F. Supp. 2d 1, 8-10 (D.D.C. 2009).

During the 2009 season, there was no charter bus service to Mariners games: KCM did not get another exception, and no private bus company was able to reach an agreement with the Mariners. To avoid a similar situation for the following season, Senator Patty Murray of Washington State sponsored an amendment to the Consolidated Appropriations Act of 2010. The Murray Amendment states:

> None of the funds provided or limited under this Act may be used to enforce regulations related to charter bus service under part 604 of title 49, Code of Federal Regulations, for any transit agency who during fiscal year 2008 was both initially granted a 60-day period to come into compliance with part 604, and then was subsequently granted an exception from said part.

Pub. L. No. 111-117, § 172 (2009). The only public transit agency that meets this definition is KCM. Thus, the Amendment ensured that the FTA could not spend appropriated funds to enforce the Charter Rule to bar KCM from providing bus service to Mariners games in Fiscal Year (FY) 2010. Moreover, although the Murray Amendment originally applied only to FY 2010 funds, Congress has since enacted a series of

---

service, whether inside or outside the urban area, *see* 49 C.F.R. § 604; 73 Fed. Reg. 2327 (2008) (explaining agency rationale). Because no party disputes (or even addresses) the authority for the regulations' scope, we assume for purposes of this opinion that the Charter Rule bars KCM's special bus service.

5

continuing appropriations acts that effectively retain the Murray Amendment's limitation through the end of FY 2011.[2] In April 2010, KCM resumed operating its charter bus service for weekend Mariners home games between the team's stadium and four park-and-ride locations.

In May 2010, two national trade associations representing the private charter bus industry -- UMA and the American Bus Association (ABA) -- filed complaints in district court charging that the Murray Amendment violates the constitutional rights of their members. They alleged that, by singling out private charter bus operators in King County as the only such operators that cannot enforce the Charter Rule against a competitor (KCM), the Murray Amendment violates those operators' First

---

[2]The acts continue the funding from the Consolidated Appropriations Act of 2010, in which the Murray Amendment appeared. *See* Pub. L. No. 111-242, 124 Stat. 2607 (Sept. 30, 2010); Pub. L. No. 111-290, 124 Stat. 3063 (Dec. 4, 2010); Pub. L. No. 111-317, 124 Stat. 3454 (Dec. 18, 2010); Pub. L. No. 111-322, 124 Stat. 3518 (Dec. 22, 2010); Pub. L. No. 112-4, 125 Stat. 6 (Mar. 2, 2011); Pub. L. No. 112-6, 125 Stat. 23 (Mar. 18, 2011); Pub. L. No. 112-10, 125 Stat. 38, Slip Copy § 1101(a)(6) (Apr. 15, 2011). The first of these continuing appropriations acts, which extended funding until December 3, 2010, stated that "[n]o appropriation or funds made available . . . pursuant to [the act] shall be used to initiate or resume any project or activity for which appropriations, funds, or other authority were not available during fiscal year 2010." Pub. L. No. 111-242, § 104. Each of the five subsequent acts extended the application of that act (and of its limiting provision) for a short period of time. The seventh and final continuing appropriations act continues the 2010 funding through September 30, 2011. Pub. L. No. 112-10, § 1106. It contains limiting language similar to that in the first act. *Id.* § 1105.

Amendment right to petition and Fifth Amendment right to equal protection. They also charged that the Murray Amendment violates their members' right to procedural due process under the Fifth Amendment and is inconsistent with separation of powers principles. After a hearing on the merits, the district court held the Murray Amendment unconstitutional on Petition Clause and equal protection grounds and ordered the FTA to enforce the Charter Rule with respect to KCM. *Am. Bus Ass'n v. Rogoff*, 717 F. Supp. 2d 73, 92 (D.D.C. 2010). The court did not reach the due process or separation of powers claims.

The FTA appealed, and a special panel of this court stayed the district court's decision pending appeal. *See* Order at 1, *Am. Bus Ass'n v. Rogoff*, No. 10-5213 (D.C. Cir. July 13, 2010). Because a constitutional challenge to a statute "presents a pure question of law," we consider the plaintiffs' claims de novo. *Eldred v. Reno*, 239 F.3d 372, 374 (D.C. Cir. 2001).[3]

## II

The plaintiffs contend that the Murray Amendment violates their Fifth Amendment right to equal protection[4] by keeping "only those private charter operators in the Seattle, Washington geographic region from enjoying the protections afforded by the

---

[3]For the reasons stated by the district court, we agree with the parties that the plaintiffs have associational standing to assert the constitutional claims of their private bus operator members. *See Am. Bus Ass'n*, 717 F. Supp. 2d at 83-84.

[4]*See News Am. Publ'g, Inc. v. FCC*, 844 F.2d 800, 804 (D.C. Cir. 1988) (explaining that "the Supreme Court has found [the] essential mandate" of the Fourteenth Amendment's Equal Protection Clause "inherent in the Due Process Clause of the Fifth Amendment and therefore applicable to the federal government").

Charter Rule." ABA Compl. ¶ 71; *see* UMA Compl. ¶ 80. Ordinarily, such economic regulation would be reviewed only for minimum rationality. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993); *see infra* Part III. Although stricter scrutiny is required for classifications that "proceed[] along suspect lines []or infringe fundamental constitutional rights," *Beach Commc'ns*, 508 U.S. at 313, those exceptions do not apply here. Private bus companies do not represent a suspect class, and their interest in providing service to baseball games without competition from subsidized public buses is not a fundamental interest.

Nonetheless, the plaintiffs contend and the district court found that heightened scrutiny is required because the plaintiffs allege an equal protection violation intertwined with a violation of their First Amendment right to petition. In *News America Publishing, Inc. v. FCC*, we concluded that legislation that "burden[ed] a single publisher/broadcaster" had to be scrutinized "under a test more stringent than the 'minimum rationality' criterion typically used for conventional economic legislation under equal protection analysis." 844 F.2d 800, 802 (D.C. Cir. 1988). Applying that precedent, the district court first determined that the Murray Amendment burdens the plaintiffs' Petition Clause rights, and then applied a more stringent form of equal protection scrutiny -- which it found the Murray Amendment could not withstand.

At issue in *News America* was a statutory provision that specifically barred the FCC from granting one -- and only one -- publisher the extension of a waiver it needed to acquire television broadcast licenses. 844 F.2d at 802-03. The challenged provision thus prevented that publisher from broadcasting on those stations, directly burdening its freedom of speech. In this case, the plaintiffs contend that the Murray

Amendment directly burdens their right to petition the government.  We disagree.

The First Amendment's Petition Clause provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. CONST. amend. I.  "The right to petition is cut from the same cloth as the other guarantees of [the First] Amendment, and is an assurance of a particular freedom of expression." *McDonald v. Smith*, 472 U.S. 479, 482 (1985). The right "extends to [petitioning] all departments of the Government," including administrative agencies and courts. *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

The plaintiffs maintain that the Murray Amendment abridges their right to petition because it bars the FTA from "receiv[ing] and adjudicat[ing] requests for advisory opinions, requests for cease and desist orders, or complaints filed by private operators who are harmed by the provision of charter service" by KCM.  ABA Compl. ¶ 59; *see* UMA Compl. ¶ 68.[5] Although the government's reading of the Amendment in the district court was less than clear, it now maintains that the Amendment only bars it from expending funds to enforce the Charter Rule itself.  The plaintiffs may still request advisory

---

[5]The plaintiffs also suggest that the Murray Amendment denies them access to the courts.  That contention is plainly incorrect: nothing in the Amendment refers to the expenditure of funds by the courts, and this litigation itself demonstrates that such access has not been denied.  The plaintiffs are also wrong in their specific contention that the Amendment effectively cuts off judicial review of statutory claims because it bars the FTA from rendering a response that can be appealed.  Even if it were true that the Amendment bars the FTA from responding, *but see* discussion *infra*, the APA authorizes courts to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1).

opinions and cease and desist orders and may still file complaints. Gov't Br. 15. (Indeed, in May 2010, UMA did both. *See Am. Bus Ass'n*, 717 F. Supp. 2d at 81.) And the FTA may still respond to such requests and complaints. Gov't Brief at 15-16; *see* Oral Arg. Recording at 3:10 - :45. The government is plainly right that the Murray Amendment does not bar the plaintiffs from making (or the agency from receiving) such requests and filings. And while the Amendment could arguably be read to prohibit the government from expending funds to respond, the agency reasonably reads it as permitting responses, and we see no reason to construe it otherwise. *See Wash. Legal Found. v. Henney*, 202 F.3d 331, 336 (D.C. Cir. 2000) (finding it inappropriate to "rule on the constitutionality of a hypothetical interpretation of a statute" where the administering agency adopted a contrary interpretation at oral argument).

The plaintiffs' principal argument is that this is simply not enough. They contend that "[a]llowing [plaintiffs] to file a formal complaint, but not allowing the FTA to issue a favorable ruling, does not satisfy [their] right to petition." ABA Br. at 9. The government agrees, of course, that the Murray Amendment does *not* allow the FTA to issue the plaintiffs a favorable ruling. For the duration of the appropriations limitation, the Murray Amendment bars the agency from enforcing the Charter Rule against KCM; accordingly, the FTA may not issue a cease and desist order against, or cut off federal funds to, KCM. And while the FTA may be able to issue an advisory opinion, the only advice it can give is that the Amendment ties its hands. In the plaintiffs' view, this renders the Amendment unconstitutional because "the Petition Clause guarantees meaningful consideration of the petition, a decision, and the possibility of a remedy." ABA Br. at 9.

We should pause for a moment and consider what the legal landscape would look like if the plaintiffs were right that "allowing [them] to file a formal complaint, but not allowing the FTA to issue a favorable ruling, does not satisfy [their] right to petition." *Id.* at 9. If that were correct, then Congress could not enact a statute barring EPA from issuing (or rescinding) a greenhouse gas rule, because such a statute would deny environmentalists (or industry) the right to petition the agency for such a rule (or for its rescission). Closer to home, if the plaintiffs were correct that the Murray Amendment violates their petition right because it prevents them from successfully petitioning the FTA to enforce the Charter Rule against KCM, then the district court has violated KCM's own petition right because its order -- *requiring* the FTA to enforce the Charter Rule -- prevents KCM from successfully petitioning the FTA not to do so.

It should be no surprise, therefore, that precedent is against the plaintiffs. Far from holding that the Petition Clause requires the possibility of a *remedy*, this circuit held in *We the People Foundation, Inc. v. United States* that the clause does not even "guarantee[] a citizen's right to receive a government *response* to *or* official *consideration* of a petition for redress of grievances." 485 F.3d 140, 141 (D.C. Cir. 2007) (emphases added). Similarly, in *Minnesota State Board for Community Colleges v. Knight*, the Supreme Court held that, although the First Amendment surely "protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances," 465 U.S. 271, 286 (1984) (internal quotation marks omitted), "[n]othing in the First Amendment . . . suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues," *id.* at 285 (citing *Smith v. Ark. State Highway Emp., Local 1315*, 441 U.S. 463, 464-65 (1979)).

This court's decision in *Marijuana Policy Project v. United States*, 304 F.3d 82 (D.C. Cir. 2002), is also instructive. At issue there was a congressional appropriations rider that denied the District of Columbia authority to enact (including via the ballot initiative process) any law reducing marijuana penalties. Rejecting a claim that the rider violated the rights of plaintiffs who wanted to speak and petition in favor of a medical marijuana law, we determined that the rider "restricts no speech; to the contrary, medical marijuana advocates remain free to lobby, petition, or engage in other First Amendment-protected activities to reduce marijuana penalties." *Id*. at 85. All the rider did, we said, was establish "limits on [D.C] legislative authority -- as opposed to limits on legislative advocacy." *Id.* And that did not violate the First Amendment because the Amendment "confers no right to legislate on a particular subject." *Id.* at 85. The rider, we noted, "silences no one; it merely shifts the focus of debate . . . from the D.C. legislative process . . . to Congress." *Id.* at 86.

The parallels between *Marijuana Policy Project* and this case are evident. The plaintiffs here remain free to speak and petition in favor of barring KCM from continuing its special bus service. All the Murray Amendment does is limit the FTA's authority to enforce such a bar. Accordingly, if the plaintiffs want their efforts "to have legal effect, . . . [they] must be directed to Congress rather than" the FTA. *Id.* at 85.

The plaintiffs insist that these precedents are inapposite because they involved petitioners seeking discretionary policy decisions, rather than a "complainant [who] was denied the ability to seek redress *for rights* granted by a statute or rule." ABA Br. at 16 (emphasis added). "[U]nlike the petitioners in *Knight* and *We the People*," ABA maintains that it "does not challenge policy decisions, but seeks to vindicate legal rights guaranteed it and its members by statute." ABA Br. at 18; *see*

ABA Supp. Br. at 12-14 (distinguishing *Marijuana Policy Project* on similar grounds).[6] Because ABA's members assertedly have "rights" under the Transit Act and Charter Rule, ABA Br. at 16, the plaintiffs contend that the relevant precedents are not *We The People*, *Knight*, and *Marijuana Policy Project*, but rather cases like *Bill Johnson's Restaurants, Inc. v. NLRB* and *NAACP v. Button* -- cases in which the Supreme Court held that the government had unlawfully restricted a complainant's ability to seek remedies for rights guaranteed it by law. *See Bill Johnson's*, 461 U.S. 731, 742-43 (1983) (holding that the NLRB could not bar an employer from pursuing a well-grounded lawsuit for damages under state law); *Button*, 371 U.S. 415, 428-29 (1963) (holding that Virginia could not bar the NAACP from encouraging and financing desegregation suits intended to vindicate Fourteenth Amendment rights).

There are two flaws in this argument. First, notwithstanding the plaintiffs' insistence on doctrinal distinctions between rights and remedies,[7] the fact remains that,

---

[6]The plaintiffs also distinguish *We the People* on the ground that the government officials in that case *chose* not to respond to the plaintiffs' petitions; no law barred them from doing so. Although that is factually correct with respect to *We the People*, it is not true for *Knight*, which involved a Minnesota statute pursuant to which public employers (state agencies) could "neither 'meet and negotiate' nor 'meet and confer' with any members of [certain] bargaining unit[s] except through their exclusive representative." 465 U.S. at 275.

[7]In the government's view, the plaintiffs have neither rights nor remedies: "Because the Charter Rule does not apply to KCM during the 2010 fiscal year," the government argues, "plaintiffs have no rights under the Charter Rule [to enforce] against KCM." Gov't Br. at 19 (internal quotation marks omitted). *Cf. Miller v. French*, 530 U.S. 327, 347 (2000) ("By establishing new standards for the enforcement

for the duration of the appropriations limitation, the FTA cannot enforce the Charter Rule against KCM. Hence, far from demanding something that they have a *right* to expect from the agency, they are making a request that the FTA lacks even the discretion to grant.

Second, and more important, in *Bill Johnson's* and *Button* the government interfered with *the plaintiffs' ability to express their views* to a decisionmaker -- in both cases, to a court. Here, by contrast, Congress has instead interfered with *the decisionmaker's ability to grant the remedy* the plaintiffs seek. No case holds that this kind of interference -- whether with rights or remedies -- abridges the Petition Clause. *Cf. Marijuana Policy*, 304 F.3d at 85 ("The [plaintiff] cites no case, nor are we aware of one, establishing that limits on legislative authority -- as opposed to limits on legislative advocacy -- violate the First Amendment.").

It is true that the plaintiffs cannot persuade the FTA to enforce the Charter Rule against KCM. But that is not because Congress has prohibited them from "seeking redress" from the agency; it is because Congress has deprived the agency of the funds necessary to grant the redress the plaintiffs seek. It is likewise true that the plaintiffs cannot persuade a court to overturn the FTA's refusal to enforce the Rule on the ground that it is arbitrary or contrary to law. *See* APA, 5 U.S.C. § 706(2)(A). But that is not because Congress has barred the plaintiffs from arguing their case; it is because an agency does not act arbitrarily or unlawfully when it follows the mandate of Congress.

---

of prospective relief, . . . Congress has altered the relevant underlying law."). In light of the discussion that follows, we need not resolve that issue.

At bottom, the obstacle that blocks the plaintiffs' ability to invoke the Charter Rule against KCM is Congress' retraction of the only remedy it had previously authorized for a transit system's violation of the Charter Rule: enforcement by agency action. *See* 49 U.S.C. § 5323(d)(2)(B), (C); *see also Am. Bus Ass'n*, 717 F. Supp. 2d at 86 (noting that the Transit Act "does not create a private right of action" for parties aggrieved by its violation (internal quotation marks omitted)). There is nothing in the Petition Clause, however, that bars Congress from changing its mind about whether or how its statutes may be enforced. If there is a *constitutional* problem with that retraction -- a question we pursue further in Part III -- it does not sound in the First Amendment.

## III

Having concluded that the Murray Amendment does not burden the plaintiffs' First Amendment right to petition, the remainder of their constitutional challenges are readily resolved.

As we noted in Part II, in the absence of a suspect class or fundamental right, or an intertwining with the First Amendment, the plaintiffs' charge that the Murray Amendment violates equal protection by singling out KCM's competitors for special treatment is subject only to rational-basis review. *See Beach Commc'ns*, 508 U.S. at 313; *see also News Am.*, 844 F.2d at 802. Under that standard, we must uphold the Amendment as long as there is a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). We find such a relationship here.

KCM successfully provided charter service to Mariners games for more than ten years. In 2009, when the Charter Rule barred it from continuing those services, no charter service was

available to Mariners fans. According to Senator Murray, the Charter Rule "resulted in several specific problems in the Seattle region including private charter operators that were unable to accommodate handicapped fans, drastically increased fees for service, inconvenient and delayed staging, and increased congestion." Press Release, Sen. Patty Murray, Murray Provision Will Restore Metro Bus Service to UW, Mariners, Seahawks Games (Dec. 9, 2009) (J.A. 46). Because the Amendment is rationally related to the legitimate governmental goals of accommodating handicapped fans, restoring more affordable service, and reducing traffic congestion on game days, it readily passes muster under the rational-basis test.

The critique of this rationale, which won the day for the plaintiffs under the heightened scrutiny applied by the district court, cannot prevail when the rational-basis test is applied. It may be true that the government's interest in affording convenient transportation to baseball games is not compelling. *But cf. Flood v. Kuhn*, 407 U.S. 258, 264 (1972) ("'Baseball's status in the life of the nation is so pervasive that it would not strain credulity to say the Court can take judicial notice that baseball is everybody's business.'" (quoting *Flood v. Kuhn*, 309 F. Supp. 793, 797 (S.D.N.Y.1970))). But rational-basis review requires only a legitimate interest. It is certainly true that the rationale set forth in the preceding paragraph was not expressly stated by Congress, and instead finds its expression in a press release issued by Senator Murray. Under rational-basis scrutiny, however, "a legislature . . . need not 'actually articulate at any time the purpose or rationale supporting its classification.'" *Heller*, 509 U.S. at 320 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 15 (1992)). Rather, a statute "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (quoting *Beach Commc'ns*, 508 U.S. at 313).

Of course, there may well be another side to the story: the plaintiffs contend that "there are privately-owned charter operators willing and able to provide affordable, efficient, and accessible service to Mariners games." ABA Br. at. 7. But rational-basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Beach Commc'ns*, 508 U.S. at 313. The plaintiffs may also be right that the Murray Amendment is both underinclusive because baseball fans in other cities might benefit from a similar exemption, and overinclusive because the exemption could be limited to cases in which private charter service is proven to be inadequate or unaffordable. *See Am. Bus Ass'n*, 717 F. Supp. 2d at 91. But "courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller*, 509 U.S. at 321.

Indeed, neither the district court nor the plaintiffs dispute this analysis. The court did not disagree that the Murray Amendment would "withstand" rational-basis scrutiny, although in its estimation only "barely" so. 717 F. Supp. 2d at 92. And the plaintiffs' appellate briefs do not argue that they can win if such minimum scrutiny is applied.

In addition to their Petition Clause and equal protection claims, the plaintiffs also charge that the Murray Amendment violates both their Fifth Amendment procedural due process rights and separation of powers principles. The district court did not reach those arguments, and the plaintiffs give them short shrift in their appellate briefs. And for good reason. Even if the plaintiffs were correct that the Charter Rule gave them a property interest in operating free from federally-subsidized competition, the Supreme Court has made clear that the legislative process provides all the *process* that is constitutionally due before Congress may enact a provision like the Murray Amendment. *See Atkins v. Parker*, 472 U.S. 115,

128-30 (1985); *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445-46 (1915); *Decatur Liquors, Inc. v. District of Columbia*, 478 F.3d 360, 363 (D.C. Cir. 2007). As for the claim that Congress transgressed the separation of powers by stripping the FTA of its authority to enforce the Charter Rule against KCM, there is no transgression when Congress does nothing more than prospectively withdraw an enforcement authority it had previously conferred. *See Miller v. French*, 530 U.S. 327, 347 (2000); *Robertson v. Seattle Audubon Soc.*, 503 U.S. 429, 437-41 (1992). Accordingly, the plaintiffs' subsidiary arguments have no greater purchase than their principal claims.

## IV

For the foregoing reasons, we conclude that the Murray Amendment is not unconstitutional. If the plaintiffs wish to prevent KCM from taking Mariners fans out to the ball game, they will have to direct their petitions to Congress. The judgment of the district court is

*Reversed.*